J. T. MEDLIN v. MARY BUFORD et al.

*Action to Foreclose Mortgage—Deed, Void and Voidable—Fraud in Factum—Fraud by Representation or Treaty.*

1. No rights can be based upon a deed that is *void*, whereas fair titles may be derived from a deed that is *voidable* only.

2. A deed into which fraud enters in the *factum* is absolutely *void;* whereas a deed that is obtained by fraudulent representation or concealment is *voidable*, and can be relieved against only in equity.

3. Where one who could read was induced to sign a mortgage, upon the representation of another that it was not a mortgage, but "only a lien that could be done away with in thirty days," and the grantor did not require the instrument to be read, the fraud was not in the *factum*, but in the "representation or treaty."

4. In such case, the mortgage is good in the hands of a mortgagee who advanced money upon it to an agent of the mortgagor, and had no notice of the fraud practiced upon the mortgagor.

5. In such case, the fact that the note which the mortgage purported to secure was not signed by the mortgagor, does not prevent the foreclosure of the mortgage.

6. Where parties for whom an attorney had invested money were requested by him to give a lien upon their property for $1,000, so that he could in some way, which he said would be safe for them, "put it out" and increase the income from the existing instrument, signed a mortgage without reading or having it read to them, acknowledged its excution before the Clerk and entrusted it to the attorney, who obtained $1,000 on it from a lawyer and kept the proceeds for his own purpose: *Held*, such parties, by their gross negligence and blind confidence, invested the attorney with all the *indicia* of agency to obtain money on faith of the mortgage and were bound by his acts, although they received no part of the money.

This was an action brought by the plaintiffs to foreclose a mortgage executed by the defendants to the *feme* plaintiff Sallie Medlin, and tried upon certain issues submitted to the jury at the June Term, 1893, before *Connor, J.*

The following are the issues and the responses of the jury to the same:

"1. Did the defendant Mary E. McGirt execute the note described in the complaint? Answer: No.

"2. Were the defendants induced to execute the mortgage by the false and fraudulent representations of John C. Davis? Answer: Yes.

"3. Did the defendants, or any of them, receive any money at all from plaintiffs' attorney Cutlar for the note and mortgage sued on. Answer: No.

"4. Was John C. Davis the agent or attorney of the defendants? Answer: No.

"5. Was the fraud practiced on defendants, if any was practiced by John C. Davis in procuring the execution of said deed, brought to the knowledge of the plaintiff or her attorney before she accepted the same? Answer: No."

DuBrutz Cutlar, a witness for the plaintiffs, testified as follows: " I drew the mortgage; the blanks in the printed form are filled in by me; John C. Davis had no connection with the preparation of it; I knew very little of Mrs. McGirt; John C. Davis came to my office representing himself as the attorney for Mrs. McGirt, wishing to borrow $1,000; I had a mortgage signed by one R. H. Smith to Mrs. Medlin; I told Davis that he must find Smith, that I knew nothing of him; he said that he would fix it; he came to my office about one or two days before the execution of the mortgage in controversy and paid the R. H. Smith mortgage; he asked me what I was going to do with the money; I told him that I would lend it out; I wrote my client at Mount Airy; Davis called again, and said that he wanted to borrow $1,000 for Mrs. McGirt; I agreed to let him have it upon the execution of the note and mortgage; he agreed to this; I prepared the note and mortgage and gave them to him; he brought them back signed; I paid him the $1,000 in gold which he had paid me in settlement of the R. H. Smith note; John C. Davis did not in any manner represent the plaintiff; I represented her; I was her attorney; I never heard or had brought to my knowledge anything wrong about the note and mortgage before paying the money; this paper, purporting to be the note in controversy, was written by me; I have had experience in my profession in regard to handwriting; I have noticed that members of a family write alike; I had no communication with Mrs. McGirt before letting Davis have the money for her; I gave Davis the money after he had brought back the note and mortgage, signed and probated, after he delivered same to me."

*Cross-examination.*—" This was the first transaction of a business character that I had with Davis. I had frequent transactions with him afterwards. The note of R. H. Smith was put into my hands in July by Mr. R. H. Beery for Mrs. Medlin. I had several notes and mortgages put into my

hands by Mrs. Hancock, a sister of Mrs. Medlin and daughter of Mrs. Grafflin. Five mortgages were put into my hands by Mrs. Hancock, Mrs. Grafflin and Mrs. Medlin in July. They were all for loans made by John C. Davis. I suspected that they were all forged, but did not know it. I examined the records for the Robert H. Smith mortgage and discovered that there was no conveyance on the records for the lot to Robert H. Smith, and I did not know any such man. Davis assured me, however, that there was such a man; that he had brought him down from Wilson with other workmen to assist in building the new Fifth Street Methodist Church, and that he, Smith, was then working in the country. The mortgage of Smith was cancelled the 23d of July, 1891, by me as attorney for Mrs. Medlin. I also examined the records for the James L. Long mortgage for Mrs. Hancock. I could not find any such person or any conveyance on the records; it is cancelled on the same day, July 23. The mortgage of R. H. Smith was cancelled the 19th of August, 1891, the same day the mortgage in controversy was filed for registration. I found that the Long mortgage was executed in the same way as the R. H. Smith mortgage, and suspected that it was forged and fictitious; there were no such persons. I thought that there was a resemblance between the signature to the R. H. Smith mortgage and the handwriting of John C. Davis. I told Davis that I could find no such person as the maker of the mortgage; that I was very unhappy about it, as my clients also were. I had told Mr. Beery, the agent of my clients, that I could not find the parties to the mortgages or any evidence of title in them. I learned, before this transaction, that Mr. Junius Davis had in his hands mortgages to Mrs. Oakley of the same suspicious character as the Long and Smith mortgages. I do not think that he showed them to me. John C. Davis paid me one thousand dollars in gold in settlement of the R. H. Smith mortgage; I do not know where he got the money; I did not threaten to prosecute him.

Davis was anxious to get this money. He paid me only the ordinary fee for drawing the papers and searching Mrs. McGirt's title. Davis, at that time, stood as high as any man in the community. I went to see Mrs. McGirt; I did not go at the time of the transaction to see whether she got the money or signed the note. It was several months after this before I heard that there was anything wrong. When I went to see Mrs. McGirt she said that she did not sign the note; she never signed anything but the mortgage; that Davis told her that it was a lien upon her house; that Davis told her about what she had said in her answer. When Davis paid me the thousand dollars it was not with the understanding that he was to borrow again; he said that he had friends who would help him. There was no connection between the payment of the R. H. Smith mortgage and the loan to Mrs. McGirt. There was a mortgage of George Hall among the five given me by Mr. Beery; it was paid under the same circumstances. I loaned it all out to Davis' friends, LeGwin Brothers and others. The Hall mortgage was cancelled the 19th of August, 1891. I loaned in all ten thousand dollars. I went to see Mrs. McGirt just before I brought this suit. She said that she executed the mortgage supposing that it was a lien upon her house for one thousand dollars for the purpose of putting it with two thousand dollars that he already had in his hands for her children, and that he would pay her twenty-five dollars per month."

Thomas Evans, a witness for the plaintiff, testifies as follows: "I have made the comparison of handwriting a study. Thirty years ago I took lessons in counterfeit detection. I have given more than ordinary study to it. I have practiced it and think that I am an expert. The signature to the note is in the same handwriting as the signature on the mortgage, as to the name of Mary E. McGirt. They are very similar; one is in a larger hand than the other. They are more similar than usual; the note is the larger."

The following evidence was submitted on the part of the plaintiff:

The note and mortgage executed by Mary McGirt, Mary Buford and Elizabeth Buford to Sallie Medlin, dated the 12th of August, 1891, acknowledged and duly recorded. The mortgage was partly written and partly printed on pink paper.

Mrs. McGirt, one of the defendants, testified as follows: " I knew John C. Davis fifteen years. I am a member of the Fifth Street Methodist church; have been for eleven years. John C. Davis was a member of the same. My husband's life was insured for $2,000 for my children and myself. He died August, 1890. I went to see Mr. Davis; he advised me to qualify as guardian; he said he would give the bond; he went on my bond. I let him put my money out at interest. This continued for a year, when he came and said that he wanted to make a proposition; that he had the $2,000 out at such good interest that if I would give a lien on my house for $1,000 he would put it out with the $2,000 and pay me $25 a month. The afternoon of that day or the morning of the next he came back. I would not take any steps until I consulted with my mother. I called my mother in. He brought the paper (mortgage); my mother protested against any mortgage on the house. He said that it was no mortgage, that it was a perfectly safe transaction; that she could do away with it in thirty days; he did not read it. We signed the paper under the circumstances. He took the paper off and came back the next day with Colonel Taylor. Colonel Taylor presented the paper and asked us if it was our signature. We acknowledged it. It was never read to us until last year. I first saw the note last fall, after the suit was commenced. I never signed the note; I did not know, until several days after it was signed, that the paper I did sign was a mortgage. I heard that John C. Davis was involved about a week after I signed it. I went to see him; I told him what I had heard." (The plaintiffs

objected to the declarations of the defendant to Jno. C. Davis, after the signing of the paper. Objection overruled, the Court admitted it as corroborative evidence. The plaintiff excepted). " I told him that I was nearly crazy; I asked him where that paper was that he had me to sign the week before, concerning our house. He said that he would give it to me in a day or two." (The plaintiffs objected to the declarations of the defendant to John C. Davis after the signing of the paper. Overruled; admitted as corroborative; exception by plaintiff.) " He would never tell me where it was. I did not know that it was in Mr. Cutlar's hands for some months after. I went to Mr. Davis a good many times for the paper. I did not get it or learn where it was. I do not consider, in the case of that mortgage, that I had any attorney; it was an unsought for thing. I never paid him any fees; he never asked for any. I remember the conversation with Mr. Cutlar. I first saw the note last fall when Mr. Cutlar brought it. Mr. Cutlar said that he had heard that I had hard feelings towards him. I told him that I had; that when he knew that John Davis was a fraud, he took the mortgage against me. Mr. Cutlar said that he did not know that Davis was a fraud."

*Cross-examination.*—" I first knew Davis when he became Superintendent of the Sunday School. I went to him about collecting the insurance money; he advised me to become guardian of my children. He and Mr. Summerell became my sureties; he had the money as surety. He never came to my house until the mortgage transaction. I went to his office often. He said that he would advance $1,000 of his own money. He said that he had the $2,000 out. He paid me $30 the latter part of November, 1890, as the interest on my $400. This was all he ever paid me. He said that he would make arrangements to pay me monthly. I did not know then what a lien was; I know now that a mortgage is a lien. He said that it was a transaction between us. We protested against doing anything to endanger our home. I

lost confidence in him on the Monday following. I have a good education, a good common school education. I expected Davis to hold the paper. Mr. Cutlar said that he did not know at the time that he took the mortgage that Davis was a fraud. Davis never gave me any paper to show for the $2,000. Mr. Summerell, the surety, paid the $1,600, the children's money."

Mrs. Mary Buford, one of the defendants, testified as follows: " I am one of the defendants. I signed the pink paper, the mortgage. I knew John C. Davis. I have known him by sight for several years. I knew him well after he became Superintendent of the Fifth Street Sunday School. I am a member of Fifth Street church. I had known him two years before I signed the mortgage. I was not in the room the first time Davis came. My daughter told me the day that he came what he said. She said that he had proposed to take a deed for $1,000 to put with the $2,000 that he had. When he came again I was in the room. He said that he wanted to do us a favor; that we give a deed for $1,000 to be put with the $2,000 that he had. I said that I would not sign any mortgage to endanger our house. He said that the transaction was a safe one; that it was not a mortgage. He was indignant. He had only one paper. No other paper was signed by my daughter. He came back the next day with Colonel Taylor and brought the mortgage or pink paper; no other. We acknowledged our signatures. I had several conversations with Davis afterwards. I told him that I wanted the paper back as he had promised; I did this repeatedly." (Plaintiff objects and excepts. Defendants offer to show his declarations. Objected to; objection sustained. Exception by defendants.) " I signed the paper without reading it, because I thought what he said was true."

*Cross-examination.*—" I thought that it was a lien; Davis said so. Mrs. McGirt told me that there was a mortgage found among John C. Davis' papers to us securing the $1,000.

I do not know why I did not ask him to read the paper; I can read. Colonel Taylor asked me if that was my signature. I was present when Mr. Cutlar came. He had the paper. He said that he did not know that John C. Davis was a fraud when he took the mortgage. I expected Colonel Taylor to give the paper to John C. Davis."

Mrs. McGirt, one of the defendants, recalled: "John C. Davis nor anyone for him gave me any mortgage or security for the money. I never had any such paper."

John D. Bellamy, Jr., a witness for the defendants, testified as follows: "No mortgage was ever given to me or my father for Mrs. McGirt."

Mr. DuB. Cutlar, a witness for the plaintiffs, was recalled and testified as follows: "Davis gave me an insurance policy on the house, payable to Mrs. McGirt and Mrs. Buford and assigned to Mrs. Medlin by the agent for $500, dated 1st of September, 1890, expiring 1st of September, 1891; increased $200 August 26, 1891. It may have been left with me at the time or some days afterwards. It was brought by Davis."

Mrs. McGirt, one of the defendants, was again recalled and testified as follows: "On Saturday after I signed the mortgage on Tuesday, Davis came and asked me to let him see my policy. He said that my policy was not for enough. He proposed to increase it. He took the policy, and I never saw it again until now. I never authorized him to deliver it to Mr. Cutlar or Mrs. Medlin. I did not pay the premium for the increase. I believed him to be a truthful, honest man. He had money of mine in his hands to pay the insurance."

Counsel for the plaintiff requested his Honor to charge as follows: "If the jury believe that J. C. Davis took the mortgage deed from Mr. Cutlar as attorney for Mrs. Medlin, under the circumstances testified to by Cutlar, and Davis brought back the deed properly signed and proved before the Clerk of the Superior Court of New Hanover County, that Mr. Cut-

lar had the right to infer that Davis was authorized to act for Mrs. McGirt, and if said Cutlar allowed said Davis to have the money under the circumstances testified to, and Mrs. McGirt did not get a cent of it, Mrs. McGirt would be bound by Davis' acts." His Honor refused the instruction, and plaintiff excepted.

The case being given to the jury, they returned the verdict as hereinbefore stated.

The plaintiff moved for a new trial on the following grounds:

1. On the ground of improper admission of the declarations to John C. Davis of the defendants after the signing of the mortgage.

2. That the verdict was palpably contrary to the weight of the testimony.

3. For failure to give instructions asked for.

4. Misdirection and error in his Honor's charge to the jury.

His Honor overruled the motion. The plaintiff then moved for a judgment on the verdict, contending that on the whole evidence, as testified to by both the plaintiff and the defendants' witnesses, plaintiff was entitled to a judgment. His Honor denied the motion, gave judgment for the defendant, and plaintiff appealed.

*Mr. J. D. Bellamy, Jr.*, for plaintiff (appellant).
*Mr. T. W. Strange*, for defendant.

SHEPHERD, C. J.: The first question to be considered is, whether the mortgage executed by the defendants to the plaintiff is absolutely void by reason of fraud in the *factum*. If such be the case, it would be immaterial whether the plaintiff is an innocent party, since the deed being a nullity, no rights could be asserted under it in favor of any person whomsoever. It is this very serious consequence which influences courts to adhere strictly to the old and well-settled principle applicable to cases of this character, and tested by

these, we have but little difficulty in reaching the conclusion that the fraud in the present instance was in the representation or treaty, and not in the *factum*. A deed made by reason of this species of fraud is often said to be void, but it will be found, upon examination, that this term is indiscriminately used in connection with any deed that may be avoided, either at law or in equity. But as is said in *Somers* v. *Brewer*, 2 Pick., 191, the distinction between void and voidable deeds becomes highly important in its consequences to third persons, "because nothing can be founded upon a deed that is absolutely void, whereas from those which are only voidable, fair titles may flow." The distinction is clearly drawn in *McArthur* v. *Johnson*, Phil. Law, 317. In that case a person proposed to convey a tract of land in trust, and his brother undertook to have the deed drawn, but, without the knowledge of the vendor, inserted therein a conveyance also of another tract in trust for himself, and upon presenting the deed for execution, in reply to a question by the vendor, said that it was "all right," whereupon the latter executed it without reading it or hearing it read. It was held that the conveyance was valid at law, there being no fraud in the *factum*. The Court, after giving the surreptitious substitution of one deed for another, and the false reading of a deed, upon request, to a blind or illiterate person, as examples of fraud in the *factum*, then proceeds to speak of what is meant by fraud in the representation or treaty. "In all of the cases it will be seen that the party knowingly executes the very instrument which he intended, but is induced to do so by means of some fraud in the treaty, or some fraudulent representation or pretense. In this category is included the case of a man who can read the instrument which he signs, seals and delivers, but refuses or neglects to do so. Such a man is bound by the deed at law; though a Court of equity may give relief against it." The opinion quotes with approval the following language from 1 Shepherd's Touchstone, 56: "If

the party that is to seal the deed can read himself, and doth not, or, being an illiterate or blind man, doth not require to hear the deed read or the contents thereof declared, in these cases, albeit the deed be contrary to his mind, yet it is good and unavoidable at law, but equity may correct mistakes, fraud," etc.

In 3 Washburn Real Prop., 252, it is said: "But if the party can read, it is not open to him after executing it to insist that the terms of the deed were different from what he supposed them to be when he signed it. * * * And one who executes a deed cannot avoid it on the ground of ignorance of its legal effect. The rule on the subject is thus stated: 'A deed cannot be avoided in a court of law except for fraud in its execution, or other fraud or imposition practiced upon the grantor in procuring his signature and seal—a fraud which goes to the question whether the deed ever had any legal existence.' The law does not reach the cases of deeds procured by *undue influence* over the grantor, if he be of legal capacity. The only relief in such cases is in equity."

Applying these principles to the facts of this case as related by the defendants, who testified in their own behalf, it would seem clear that the mortgage in question is not void but voidable only in a court of equity. The defendant, Mrs. McGirt, stated that she had a good common school education, and it appears that neither she nor the other defendant read the deed or requested that it be read. They knew that the object of the deed was to raise $1,000, which was to be invested together with the $2,000, which it appears had already been invested by Davis. It is true that Davis deceived them that the deed was not a mortgage, and that they "could do away with it in thirty days," but they admit that they knew they were executing a "lien" upon their house for $1,000, although they say they did not know it was the same as a mortgage. If they had read the deed they would have discovered that it was a mortgage to the plain-

tiff securing $1,000, which she afterwards advanced upon the faith of the mortgage through her attorney, Mr. Cutlar. These and other circumstances relied upon by the defendants were not sufficient in our opinion to establish fraud in the factum. Indeed, the case does not seem to have been tried upon this theory, as the issue itself appears to have been framed for the purpose of presenting the proper view of the tendency of the testimony, which is that the deed was procured by fraud in the representation or treaty. To hold otherwise would, it seems to us, be productive of the most alarming results as to the security and stability of titles in the hands of innocent purchasers, who have acted upon the faith of conveyances actually executed by the owners, and as in this case openly and freely acknowledged before the proper authority to be their act and deed.

The deed then being voidable only in a Court of Equity, and the jury having found that neither the plaintiff nor her attorney had notice of the fraudulent conduct of Davis in procuring the execution of the same, it becomes necessary to determine whether the instruction asked by the plaintiff should not have been given. This instruction relates to the issue involving the agency of Davis in making the transaction with Mr. Cutlar, the plaintiff's attorney, and must be considered in connection with the facts admitted in the testimony of the defendants. Could the defendants under these circumstances be permitted to say that they were not bound by the acts of Davis? "It is a general and just rule, that when a loss has happened which must fall on one of two innocent persons, it shall be borne by him who is the occasion of the loss, even without any positive fault committed by him, but more especially if there has been any carelessness on his part which caused or contributed to the misfortune. A man can scarcely be cheated out of his property, especially of real estate, in such manner as to give an innocent purchaser a right to hold according to the principles

which have been mentioned, without a degree of negligence on his part which should remove all ground of complaint. Suppose him to be prevailed upon by fraudulent representations to execute a deed without asking advice of friends or counsel, he has *locus penitentiæ* when he goes before a magistrate to acknowledge it." *Somes* v. *Brewer, supra.* These general principles are well sustained and illustrated by several decisions of this Court, and the numerous authorities therein cited, and are applicable, we think, to the question under consideration. *Railroad* v. *Kitchen,* 91 N. C., 39; *Vass* v. *Riddick,* 89 N. C., 6; *Barnes* v. *Lewis,* 73 N. C., 138. According to the statements of the defendants they intended to give a lien upon their property for $1,000. This money, it must necessarily be inferred, was to be raised on the faith of the lien, and it was to be submitted to Davis, who was "to put it out" with the $2,000 he had already invested, so that the defendant could get $25 per month. The defendants, without reading the mortgage, executed the same, and it remained in the hands of Davis. Davis came the next day with the Clerk of the Court (Taylor), and the defendants acknowledged the due execution of the said mortgage, and it cannot be doubted that it remained in the hands of Davis in pursuance of the arrangement agreed upon. As we have said, had they read the instrument they would have discovered that it was a mortgage to the plaintiff for the sum of $1,000, and, so far as this case is concerned, it must be assumed that they were aware of its contents. At any rate, they admit that they knew that it was a lien for that amount, and under these circumstances they permitted the said Davis to take away the instrument obviously for the purpose of raising the money. In other words, by their gross negligence, and blind confidence in Davis, they invested him with all the indicia of agency to obtain the money of the plaintiff upon the faith of this mortgage, and as between the plaintiff and these defendants, who are all innocent parties,

115—18

it cannot be questioned as to who should bear the loss. We think the instruction should have been given, and that because of its refusal there should be a new trial.

Of course, if upon another trial it should appear that Mr. Cutlar had notice of facts sufficient to put him upon inquiry, the plaintiff would be affected by such notice, and the defendants be entitled to relief. We have examined the authorities cited by the counsel for the defendants, and see nothing in them which seriously conflicts with the principles we have declared in this opinion. The fact that the note was not executed by the defendants, does not in itself prevent a foreclosure of the mortgage. 1 *Jones on Mortgages*, 353.

New Trial.