PALMER NIXON, EXECUTOR OF CHARLIE NIXON, DECEASED, LETTIE N. BUNCH AND ADELE NIXON v. QUEEN ESTHER NIXON, CARL NIXON AND WIFE, SAVANNAH NIXON.

(Filed 9 October 1963.)

**1. Trial § 21—**

On motion for nonsuit, the evidence is to be considered in the light most favorable to plaintiff, and plaintiff is entitled to the benefit of every reasonable inference to be drawn therefrom.

**2. Trial § 22—**

Discrepancies and contradictions, even in plaintiff's evidence, do not justify nonsuit.

**3. Fraud § 2.1—**

The distinction between fraud in the *factum* and fraud in the treaty is dependent in a measure on the attendant facts and circumstances; fraud in the *factum* arises when a person is induced to execute an instrument different than the one intended so that the instrument intended to be executed and the instrument actually executed are not the same, while fraud in the treaty is based upon misrepresentations knowingly made with fraudulent intent which induce a person to execute an instrument which he otherwise would not have done.

**4. Cancellation and Rescission of Instruments § 2—**

Evidence tending to show that the owner of an interest in land was induced to execute a deed conveying his interest to two of his children by the false representation of another child that the instrument signed was a paper necessary to be executed to prevent him from losing his social security payments, that he received no consideration for the deed and that he did not know that the instrument he was executing was a deed, *is held* sufficient to raise the issue of fraud for the determination of the jury.

**5. Same; Fraud § 2.1—**

The grantees are not entitled to nonsuit in an action to annul a deed for fraud on the ground that they did not make or participate in the making of the misrepresentations inducing the execution of the instrument when the evidence tends to show that they paid no consideration and that the execution of the deed was procured by fraud, regardless of whether the fraud was fraud in the *factum* or fraud in the treaty, since if the instrument was procured by fraud in the *factum* it is a nullity even in the hands of innocent third parties, and if the fraud was fraud in the treaty a volunteer takes same tainted with the fraud.

APPEAL by plaintiffs from *Fountain, J.,* April 1963 Session of HERT-FORD.

The amended complaint alleges two causes of action: The first is to annul a deed of conveyance on the ground of alleged fraud; the second is to recover damages in the sum of $15,000 by reason of alleged fraud in procuring a deed of conveyance.

Charlie Nixon, a widower 80 years old, commenced this action against his daughter Queen Esther Nixon and his son Carl Nixon and wife by the issuance of summons on 2 April 1962. On the same day he procured an order from the clerk of the superior court to examine the defendants for the purpose of obtaining information necessary to prepare his complaint. The examination was held, and he filed his complaint on 26 April 1962. Defendants' answer was filed on 12 May 1962. Charlie Nixon died testate on 17 June 1962, and his son Palmer Nixon qualified as his executor on 27 June 1962. Plaintiffs Lettie N. Bunch and Adele Nixon are devisees in his will. By order of court the present plaintiffs were made parties plaintiff, and were allowed to file an amended complaint, which they did on 14 November 1962. Three days later defendants filed an answer to the amended complaint.

Plaintiffs offered in evidence for the purpose of attack a deed executed on 4 January 1962 by Charlie Nixon before a notary public, and duly registered on 8 January 1962, conveying to Queen Esther Nixon and Carl Nixon in fee 49.80 acres of land therein described by metes and bounds, expressly excepting therefrom two described

acres, which were devised in the Third Item of the Will of Candy Nixon to Leon Nixon. The deed recites a consideration of ten dollars and other good and valuable considerations, and has covenants to the effect that the grantor is seized of the premises in fee, and has a right to convey the same in fee simple. The complaint alleges that Charlie Nixon owned in fee the real estate conveyed by this deed. The amended complaint alleges he was the owner of a one-half undivided interest in this real estate, and plaintiffs' oral evidence is to that effect.

In January 1962 Charlie Nixon went to W. H. Roberson, assistant secretary and treasurer of Roanoke Production Credit Association, to obtain a loan to make a crop during the year. The Association agreed to make him a loan of $1,300 to be secured by a crop lien and chattel mortgage and a deed of trust upon his one-half interest in the real estate described in the deed offered by plaintiffs for attack. Palmer Nixon was made a party to the loan, because he was farming a part of the land that year. Charlie Nixon and Palmer Nixon executed the crop lien and chattel mortgage on 6 February 1962, and Charlie Nixon executed the deed of trust on the same date. Both instruments were recorded.

On 4 January 1962 Queen Esther Nixon and Carl Nixon were living with their father Charlie Nixon in his home on his land described in the deed to defendants. They had lived with him since his wife's death in 1959, farming with him, and cooking and washing for him. On 7 February 1962 Palmer Nixon, son of Charlie Nixon and afterwards his executor, who lived in the town of Ahoskie, heard of the deed his father had executed to the defendants, and that afternoon he went to his father's home. Upon his arrival he found his father, the defendants, and one Joseph Lee in the home. While there he heard his father say his land had been conveyed to the defendants, that he knew nothing about it, and had not conveyed any land to them. Queen Esther Nixon told her father she knew nothing about it. Carl Nixon made a similar statement. Charlie Nixon asked Queen Esther Nixon to go to the register of deeds' office and have it signed off the record. She called Joseph Lee into another room, talked awhile, came back, and said, "I don't know anything about it and I am not going anywhere to sign anything."

Lettie N. Bunch, a daughter of Charlie Nixon and a sister of the defendants, lives in the town of Windsor. On 8 March 1962 she learned about this deed and went that same day to her father's home. She testified as follows:

> "I went in and I saw Queen Esther and Carl and I asked
> Queen Esther what paper was that that they had made out to

take my daddy's home, and she said she did not know anything about it. My father was there and he said that Clara Watford had come to him, and asked him didn't he know he was losing his social security and he had to pay $78.00 for social security, and she had a paper for him to sign and if not he would lose his social security. I asked Queen Esther was she not going to sign papa's land back to him and she said 'No,' and I asked her why and she said 'because he put me out the door.' I asked what she meant by putting her out the door and she said because he rented the farm to Palmer. I told her that was not putting her out the door; aren't you going to sign it, and she said she was not going to sign. Then my father caught me by the arm and said, 'Come on, I am going to Ahoskie and I am going to put the law.' Carl said, 'That little Ford out there is all you have and you get in that and you get out of here.'"

In March 1962 W. H. Roberson rechecked the records in the register of deeds' office, and found that Charlie Nixon's deed to defendants had been recorded before Charlie Nixon's deed of trust to the Credit Association. In consequence of this discovery, he went to Charlie Nixon's home on 21 March 1962. Charlie Nixon, the defendants, and Palmer Nixon were there. Roberson testified on direct examination as follows:

"I asked Charlie did he remember conveying the farm to Queen Esther and Carl, and he said no, he did not know anything about it, and then I asked Carl and asked Queen Esther if they knew anything about it, and they said no. Then I asked Queen Esther if she would go by the office and sign a good deed of trust on his interest, so that he could continue getting the money and finish his farming operations, and she said, no, she was not going to sign anything; because he tried to get them off of the farm the year before; had tried to get she and Carl off the farm, and that she was not going to sign anything. I said to her, 'If he tried to get you off the farm the year before, does it not seem silly that he would turn around and give you a deed to the farm for his one-half interest in the farm?' Queen Esther and Carl said they did not know anything about it."

On 9 March 1962 Palmer Nixon, Charlie Nixon, W. H. Roberson, and the defendants were in a room in Charlie Nixon's home. Palmer Nixon testified:

"Mr. Roberson questioned them about the loan that my daddy had purchased through him for farming and he told them my

daddy came to him to find out about his land having been con-
veyed away from him and he did not know it was being con-
veyed and the only thing he knew was that Clara Watford came
to him. He told Queen Esther and Carl in the presence of all of
us that Clara Watford had come to him with some social security
papers and asked him if he knowed he was going to lose his social
security and he told her 'no,' and she said, 'you are and you are
going to lose it if you don't pay $78.00 to the Social Security
office and sign these papers that I have, and if you don't do that
you won't get any more social security.'

"When my father said that statement to her about Clara Wat-
ford, she said she did not know anything about it at all; she did
not have anything to do with it and was not going anywhere to
sign anything. Carl Nixon said to my father in this conversation
that he did not know anything about it and he wouldn't sign any-
thing concerning it."

Plaintiffs offered in evidence a part of the testimony of Queen
Esther Nixon given during her examination in the proceeding to ob-
tain information for the purpose of preparing the original complaint.
The relevant part of her testimony, after she identified the deed from
Charlie Nixon to defendants, is:

"I first saw that deed after he (Charlie Nixon) signed it. I was
at my home. Estelle and him was the one that had it. Estelle is
my sister. I saw the deed the same day it was written. He and
Estelle had it written. I didn't. I knew it was going to be pre-
pared. He had spoken about it. I did not pay anything for the
land. Estelle Ruffin lives in New York now."

Plaintiffs offered in evidence a part of the testimony of Carl Nixon
given in the same proceeding. The pertinent part of his testimony,
after the deed from Charlie Nixon to defendants was shown to him, is:

"I know about that deed. The only thing I know about it I
hear him say once before in the house that he was going to deed
'Baby,' Queen Esther, some land or something to keep the rest of
the children off of it. That's been a right good little while ago.
Almost a year or two, two or three years. Sometime about the
4th of January, Clara Watford and other sister came to my home.
They took my father and carried him to Ahoskie away from the
house. I could not say for certain. Queen Esther and I did not go.
I knew about the preparation of the deed and had nothing to do
with its being prepared. I haven't paid him a cent for no deed
at all."

Queen Esther Nixon, Carl Nixon, Palmer Nixon, Adele Nixon, Lettie N. Bunch, Estelle Ruffin, and Clara Watford are brothers and sisters and children of Charlie Nixon.

Lettie N. Bunch identified her father's signature on the deed offered in evidence by plaintiffs for the purpose of attack, and also identified as signed by her father two checks, one dated 6 November 1961 payable to Clara Watford in the amount of $78, and the other dated November 10, 1961 payable to Clara Watford in the sum of $41.13.

In 1962 the land described in the deed from Charlie Nixon to defendants had allotments of 3.1 acres of tobacco, of 8.6 acres of peanuts, and of 4.5 acres of cotton. The fair market value on 4 January 1962 of a one-half undivided interest in this land was $18,000.

From a judgment of compulsory nonsuit entered at the close of plaintiffs' evidence, plaintiffs appeal.

*Cherry & Cherry and Pritchett & Cooke by J. A. Pritchett for plaintiff appellants.*

*Jones, Jones & Jones and Leroy, Wells & Shaw by Charles C. Shaw, Jr., for defendant appellees.*

PARKER, J. It is hornbook law that when a motion for judgment of nonsuit is made, the plaintiff is entitled to have his evidence considered in the light most favorable to him, and he is entitled to the benefit of every reasonable inference to be drawn therefrom. *Bridges v. Graham,* 246 N.C. 371, 98 S.E. 2d 492. "Discrepancies and contradictions, even in plaintiff's evidence, are for the twelve and not for the court," *Barlow v. Bus Lines,* 229 N.C. 382, 49 S.E. 2d 793, and do not justify a nonsuit. *Keaton v. Taxi Co.,* 241 N.C. 589, 86 S.E. 2d 93.

Considering plaintiffs' evidence according to the rule, it would permit a jury to find that Charlie Nixon, a man 80 years old, had social security, that his daughter Clara Watford came to him with some papers and asked him if he knew he was going to lose his social security, and he told her "no," and she said to him, "you are and you are going to lose it if you don't pay $78.00 to the social security office and sign these papers that I have, and if you don't do that you won't get any more social security"; that these were misrepresentations of material facts made by Clara Watford, with knowledge of their falsity or with a reckless disregard of their truth or falsity, with a fraudulent intent that they should deceive Charlie Nixon and be relied upon by him; that under the circumstances such representations were of a character to induce action by a person 80 years old; that Charlie

Nixon reasonably relied upon the representations, and acted upon them to his injury by executing and delivering a deed of conveyance of his real estate with a reasonable market value of $18,000 to his children Queen Esther Nixon and Carl Nixon, who paid him nothing for his land; that Charlie Nixon received nothing for the conveyance of his land; that Charlie Nixon, by reason of the wilful misrepresentation of the contents of the instrument, did not know that he was executing a deed to his real estate, but intended to execute a paper writing to prevent his losing his social security payments; and that Queen Esther Nixon and Carl Nixon knew beforehand of the preparation of this deed.

"The line of demarcation between fraud in the *factum* and fraud in the treaty is frequently obscure and in a measure dependent upon the attendant facts and circumstances." *Parker v. Thomas,* 192 N.C. 798, 136 S.E. 118, where certain well-recognized indicia of fraud in the treaty and of fraud in the *factum* are stated.

It seems indubitable that if Charlie Nixon had lived to testify in the action he instituted, the record would contain clearer and fuller testimony as to the attendant facts and circumstances in respect to the execution of the deed by him to defendants. We lack in the evidence any testimony by the draftsman of the deed, and by the notary public who took his acknowledgment of the deed.

Considering the frequent obscurity of the line of demarcation between fraud in the *factum* and fraud in the treaty, it seems that plaintiffs' evidence tends to show fraud in the *factum* arising from a want of identity or a disparity between the instrument executed and the one intended to be executed, or if it does not show fraud in the *factum*, it at least tends to show fraud in the treaty in that there were misrepresentations as to the contents of the instrument and Charlie Nixon signed the identical instrument which he intended to sign. *Griffin v. Lumber Co.,* 140 N.C. 514, 53 S.E. 307; *Furst v. Merritt,* 190 N.C. 397, 130 S.E. 40; *Parker v. Thomas, supra; Mills v. Lynch,* 259 N.C. 359, 130 S.E. 2d 541. If the deed was procured by fraud in the *factum* or by fraud in the treaty, the judgment of compulsory nonsuit was improvidently entered.

The execution of a deed procured by fraud in the *factum* cannot be said to be the deed of the maker at all. "No title passes under such an instrument—it is void—and no rights may be acquired thereunder even by innocent third parties* * *." *Furst v. Merritt, supra; Medlin v. Buford,* 115 N.C. 260, 20 S.E. 463.

Parol evidence is competent to show the actual consideration for a deed or the lack of consideration. *Barbee v. Barbee,* 108 N.C. 581,

13 S.E. 215; *Pate v. Gaitley*, 183 N.C. 262, 111 S.E. 339; *Willis v. Willis*, 242 N.C. 597, 89 S.E. 2d 152. Plaintiffs' evidence tends to show not only false representations, but also a total lack of consideration for the deed. *Garris v. Scott*, 246 N.C. 568, 99 S.E. 2d 750.

Defendants contend, *inter alia*, that there is no evidence that they participated in the false representations, or that they requested or persuaded their father to execute the deed, and, therefore, that the judgment of nonsuit should be affirmed. With this contention we do not agree.

"A person may be charged with fraud, although he is not a party to the transaction into which the complainant is induced, by the misrepresentation, to enter. To render one liable in an action of deceit, no privity of contract between the plaintiff and defendant need be shown* * *. In this respect, the action differs from one on a warranty." 23 Am. Jur., Fraud and Deceit, sec. 187.

It is clear that when the execution of a deed is procured by fraud in the treaty, the grantor is entitled to appropriate relief in a court of equity as against the author of the fraud, as to any interest derived by him from the deed. *Furst v. Merritt, supra.* A transaction is not purged of fraud by a showing that it was brought about by a third person. And in case of fraud in the treaty appropriate and adequate relief will be afforded in a court of equity, not only against the principal, where he is grantee in the deed, but also against persons who were or have become beneficiaries of such fraud and wrong done the grantor in the deed, when they are volunteers or purchasers with notice, or when the deed has been procured by fraud of one who is acting in the transaction as agent of the grantee; otherwise fraud would, or could, place itself beyond the reach of the court, and an interest gained by one person by the fraud of another be held by him. *Harris v. Delamar*, 38 N.C. 219; *Tisdale v. Bailey*, 41 N.C. 358; *Beeson v. Smith*, 149 N.C. 142, 62 S.E. 888, *Ferrall v. Bradford*, 2 Fla. 508, 50 Am. Dec. 293; *Graham v. Burch*, 44 Minn. 33, 46 N.W. 148; *Jones v. Wolfe* (Tenn. Ch.), 42 S.W. 216, *Wynne v. Mason*, 72 Miss. 424, 18 So. 422; *Stone v. Walker*, 201 Ala. 130, 77 So. 554; *Porter v. O'Donovan*, 65 Ore. 1, 130 P. 393; 23 Am. Jur., Fraud and Deceit, sec. 187; Restatement of the Law of Restitution, Am. Law Institute, sec. 167. If the deed here was procured by fraud, and if the defendants claim the benefits of it as volunteers, they must take it tainted with the fraud. *Corbett v. Clute*, 137 N.C. 546, 551, 50 S.E. 216, 217.

The judgment of compulsory nonsuit is

Reversed.