Johnny OVERSTREET, Administrator
of the Estate of David Wilkey,
deceased, Plaintiff,

v.

KENTUCKY CENTRAL LIFE
INSURANCE, Defendant.

Civ. A. No. 88–0391–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Sept. 27, 1990.

S.D. Roberts Moore, Todd W. Holliday, Gentry, Locke, Rakes & Moore, Roanoke, Va., for plaintiff.

Leslie E. Hagie, William B. Poff, Roanoke, Va., for defendant.

## MEMORANDUM OPINION

TURK, Chief Judge.

Plaintiff filed this action on August 31, 1988 seeking compensatory and punitive damages from the defendant for the wrongful death of decedent, David Wilkey. Plaintiff alleges that defendant is liable for Wilkey's death because it negligently issued an insurance policy to an individual who did not have an insurable interest in the decedent's life. In the alternative, plaintiff seeks insurance benefits allegedly due under an accidental death policy issued by the defendant, asserting contract, constructive trust, and unjust enrichment theories.

Defendant has filed a motion for summary judgment, asserting that the negligence and contract claims raised in plaintiff's cause of action are barred by the statute of limitations. In addition, defendant asserts that because the insurance contract was procured through fraud, the theory of fraud *in factum* bars recovery on the contract.

Jurisdiction in this matter is based upon diversity of citizenship, 28 U.S.C. § 1332(a)(1) (1982). The parties have submitted briefs and the court has heard argument; the matter is ripe for decision by the court.

### I. STATEMENT OF FACTS

On September 14, 1983 David Fisher contacted Kenneth Tietsort, a life insurance agent for Kentucky Central Life Insurance Company ("Kentucky Central"), intending to purchase a life insurance policy. The policy was to insure the life of David Wilkey for fifty thousand dollars ($50,000), plus an additional fifty thousand dollars ($50,000) coverage for an accidental death. David Fisher was to be named owner and beneficiary of the policy. The agent permitted Fisher to complete the application, in Tietsort's North Carolina office, despite his knowledge that David Fisher did not have an insurable interest in the life of David Wilkey. Contrary to company policy, Tietsort did not personally meet with

David Wilkey prior to completing the insurance policy application. Tietsort is unsure whether he mailed the application to Wilkey for him to sign, or gave it to Fisher to take to Wilkey. However, handwriting analysis conducted during Kentucky Central's investigation concluded that the signature on the form was not Wilkey's.

Tietsort sent the completed application to the home office of the defendant in Lexington, Kentucky where it was disapproved on September 22, 1983 because Fisher did not have an insurable interest in Wilkey's life. Tietsort and Fisher discussed the rejection and decided to amend the policy's beneficiary from Fisher to Wilkey's estate so the policy would be issued. Fisher completed an amendment request by again forging Wilkey's signature, and it was sent to Kentucky Central's home office.

Kentucky Central issued a policy, with Wilkey's estate as the beneficiary, on September 27, 1983. On October 5, 1983 Fisher completed a change-of-beneficiary form requesting that Fisher be made the policy's beneficiary. As with the other forms, Wilkey's signature was forged on the change-of-beneficiary form, despite the fact that his signature was not required on the form. Kentucky Central approved the request on October 24, 1983.

On November 21, 1983, David Wilkey was fatally shot by Robert Mulligan during a hunting trip to which David Fisher was a party. Fisher contacted Tietsort a few days later and informed him of Wilkey's death. He filed a formal written claim for the one hundred-thousand dollars ($100,000) in insurance proceeds on January 9, 1984. Upon receiving this claim, Kentucky Central initiated a routine investigation, during which it reviewed the medical examiner's and sheriff department's reports, and interviewed Tietsort, Fisher, Mulligan, Wilkey's relatives and his friends.

During approximately the same period, Bedford County law enforcement officials were conducting an investigation of the shooting. They initially concluded that the shooting was accidental and charged Mulligan with reckless use of a firearm. However, the investigation was reopened in 1984 after officials became aware of the insurance policy on Wilkey's life. On April 3, 1984 Jim Updike, Commonwealth Attorney for Bedford County, contacted Kentucky Central and made an informal request for any information pertaining to Fisher's policy. Kentucky Central offered to provide him with verbal information, but declined to provide its files because of concerns for their client's privacy. Updike rejected the offer, but inexplicably never made an official request for the information. Updike's criminal investigation soon stalled.

In April 1984, upon realizing that allegedly negligent issuance of the policy to Fisher could subject it to liability to Wilkey's estate as well as require the payment of the insurance proceeds, Kentucky Central decided to consider a possible settlement with Fisher. Kentucky Central authorized John Manning, a North Carolina attorney, to approach Fisher and negotiate a settlement on behalf of Kentucky Central. Thereafter, Manning retained a handwriting expert to examine the signatures of the insurance documents, who concluded that one of Wilkey's signatures contained in the insurance documents was a forgery. Manning informed Kentucky Central that he suspected that Fisher was involved in Wilkey's death. He recommended settling with Wilkey's estate for a small amount and cooperating fully with the ongoing murder investigation. This recommendation was rejected and Manning was authorized to settle with Fisher for a maximum of twenty-five thousand dollars ($25,000).

On May 18, 1984 Manning met with Fisher and during this meeting became convinced that Fisher's story concerning the "accident" was false. At the conclusion of the meeting, Manning offered Fisher $25,000, allegedly telling Fisher that he knew Fisher had killed Wilkey. Fisher accepted the payment as full settlement of the $100,000 insurance policy.

Throughout the period from Wilkey's death until the settlement with Fisher, Wilkey's estate never contacted the insurance company or attempted to institute an investigation into Wilkey's death. In fact, Wil-

key's mother, Dianne Wilkey,[1] was the only person who was in touch with the insurance company during the period following Wilkey's death. Mrs. Wilkey had become aware of the existence of the policy when she was contacted by one of defendant's investigators shortly after Wilkey's death. Her contact was limited to two letters she sent in January 1984 in order to express hope that Fisher "would not profit from her son's death" and to request information regarding Kentucky Central's ongoing investigation. Kentucky Central never responded to her letters. Wilkey's estate apparently failed to initiate any action or investigation into the matter until over four years after Wilkey's death.

In 1986 an informant for the Federal Bureau of Investigation (FBI) provided the FBI with information which caused the FBI to initiate its own investigation of the case. The FBI submitted a formal request for Kentucky Central's files and the company complied immediately. The FBI subsequently questioned Mulligan, who eventually confessed to the murder and implicated Fisher. Fisher was indicted for the murder of David Wilkey on November 5, 1986, and convicted on July 15, 1987.

## II. STANDARD FOR SUMMARY JUDGMENT

■ Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact...." Fed.R.Civ.Proc. 56(c). In reviewing defendant's motion for summary judgment, this court must "resolve any factual issues of controversy in favor of the non-moving party...." *Lujan v. National Wildlife Fed'n,* — U.S. —, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). If the nonmoving party fails to demonstrate an element essential to its case, the moving party is entitled to judgment as a matter of

law. *Id.,* 110 S.Ct. at 3186. With this standard in mind, the court will review the facts in relation to the applicable law.

## III. WRONGFUL DEATH CLAIM

■ Plaintiff alleges that Kentucky Central is liable for the wrongful death of Wilkey because it negligently issued a policy to a person who did not have an insurable interest in the decedent's life. A number of courts have recognized that these facts may support a valid cause of action. *See, e.g. Life Ins. Co. of Georgia v. Lopez,* 443 So.2d 947 (Fla.1983); *Ramey v. Carolina Life Ins. Co.,* 244 S.C. 16, 135 S.E.2d 362 (1964); *Liberty Nat'l Life Ins. Co. v. Weldon,* 267 Ala. 171, 100 So.2d 696 (1957); *Holloman v. Life Ins. Co.,* 192 S.C. 454, 7 S.E.2d 169 (1939); *see also* Annotation, *Insurer's Tort Liability For Wrongful or Negligent Issuance of Life Policy,* 37 A.L.R. 4th 972 (1985). However, the statute of limitations in Virginia [2] for a wrongful death claim is two years. Va.Code Ann. § 8.01–244 (1984). Plaintiff's cause of action accrued on November 21, 1983, the day Wilkey was killed, yet plaintiff failed to file a complaint until August 31, 1988, well beyond the statute of limitations. Even assuming that Plaintiff's cause of action did not accrue until 1985, after Mrs. Wilkey learned that the insurance policy existed and after Bedford County reopened its investigation, the claim is still barred by the statute of limitations.

### A. *Equitable Estoppel*

■ Plaintiff asserts that the doctrine of equitable estoppel precludes defendant from asserting the statute of limitations as a defense. Equitable estoppel will preclude a defendant from asserting the statute of limitations as a defense only if the defendant made false representations or concealed material facts that he had a duty to reveal. *Beverage v. Harvey,* 602 F.2d 657 (4th Cir.1979); *American Mutual Liabili-*

---

**1.** Dianne Wilkey's present name is Dianne Leclair, and her former names include Diane Boteliho and Diane Prevalt. For the sake of avoiding confusion, this opinion only refer to her as "Mrs. Wilkey".

**2.** It is undisputed that Virginia law applies to the wrongful death cause of action. In accord with the First Restatement of Conflicts § 377 (1934), the law of the place of injury, *i.e.* the shooting, is the governing law.

*ty Insurance Co. v. Hamilton,* 145 Va. 391, 135 S.E. 21 (1926).

In support of its assertion of estoppel, plaintiff alleges two instances of concealment by the defendant. First, plaintiff claims that Kentucky Central's failure to respond to the two letters that Mrs. Wilkey sent in January 1984 was an attempt to conceal material facts. Second, Plaintiff asserts that Kentucky Central's failure to comply with Commonwealth Attorney Updike's *informal* request for information also was a fraudulent concealment of facts. However, these instances asserted by plaintiff are nothing more than the defendant's failure to speak. As it has been held, mere silence by the defendant is an insufficient ground to invoke the doctrine of estoppel. *Burton v. Terrell,* 368 F.Supp. 553, 557 (W.D.Va.1973). However troubling Kentucky Central's refusal to respond to Mrs. Wilkey's or Mr. Updike's requests for information, it is clear that defendant did not have any duty to provide either with any information. As defendant has noted in its memoranda, its decision to withhold information from Mrs. Wilkey and Updike was a business decision made with an eye toward protecting its confidential files. Kentucky Central's refusal to respond was justified by the lack of any legal obligation or relationship between Kentucky Central and those individuals. On the other hand, when the FBI made a proper, formal request for defendant's records in 1986, Kentucky Central fully and immediately complied. At no time did the company attempt to conceal any facts or evidence, despite the fact that Kentucky Central still faced potential civil liability if the FBI's investigation revealed that Fisher was involved in Wilkey's murder.

▪ Plaintiff also asserts that Kentucky Central's settlement with Fisher was an affirmative and fraudulent concealment of material facts. Plaintiff's assertion is incorrect because Kentucky Central had a right to settle its claim with Fisher, for it had a reasonable doubt as to its liability. 15A Couch on Insurance, § 59:2 (2d ed., rev.1983). Kentucky Central's investigation and Bedford County's two investiga-

tions of the shooting failed to unearth concrete evidence to support the assertion of a murder claim in a civil or criminal trial. Indeed, the crucial evidence which ultimately led to Fisher's indictment, his conversation with a government informant, obviously was unavailable to Kentucky Central at the time of its investigation. As defendant correctly asserts, the insurance company fulfilled its duty to conduct a good faith investigation before settling with Fisher. "Suspicion ... is not, by itself, sufficient to defeat a beneficiary's claim to insurance money." *Thompson v. Continental Assurance Company,* 99 Ill.App.3d 303, 55 Ill.Dec. 217, 426 N.E.2d 1 (1981); *see also Harper v. Prudential Ins. Co. of America,* 233 Kan. 358, 662 P.2d 1264 (1983). A good-faith settlement payment to the beneficiary of record is within the realm of an insurer's permissible options. *Weed v. Equitable Life Assurance Soc'y of the United States,* 288 F.2d 463, 464 (5th Cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 40, 7 L.Ed.2d 27 (1961).

#### B. *Failure to Exercise Due Diligence*

▪ Even if this court were to expand existing law and hold that the defendant's actions did constitute fraudulent concealment, plaintiff's claims must still be barred. Precedent firmly establishes that a plaintiff asserting estoppel also must demonstrate that he exercised due diligence to discover a cause of action prior to the expiration of the statute of limitations. *Ocean Acres Ltd. v. Dare County Bd. of Health,* 707 F.2d 103, 105 (4th Cir.1983); *Weinberger v. Retail Credit Co.,* 498 F.2d 552, 555 (4th Cir.1974). Due diligence has been defined as the "measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by a reasonable and prudent man under the particular circumstances...." *STB Marketing Corp. v. Zolfaghari,* 240 Va. 140, 393 S.E.2d 394, 397 (1990); *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 218 (4th Cir. 1987).

Reviewing the complete history and facts of this case in the light most favorable to plaintiff, this court concludes that plaintiff

failed to exercise the due diligence necessary to toll the statute of limitations. Mrs. Wilkey learned of the insurance policy on her son's life in January 1984, but she did not actively and vigorously pursue the matter. She sent two letters to the insurance company in January 1984. Despite the fact that she never received a reply, she did not inquire any further. Mr. Wilkey's estate apparently never attempted to pursue any investigation or informal inquiry into Wilkey's death or the insurance policy until it filed the complaint four years and nine months after Wilkey's death. As it has been observed, "equity will not afford relief to those who sleep upon their rights, or whose condition is traceable to that want of diligence which may be fairly expected from a reasonable and prudent man." *Pearce v. North Carolina State Highway Patrol Voluntary Pledge Committee,* 310 N.C. 445, 451, 312 S.E.2d 421, 426 (1984). Plaintiff's assertion of estoppel is an attempt to place a greater burden upon the defendant than plaintiff was willing to accept. In effect, plaintiff would have this court hold that Kentucky Central's detailed investigation into Fisher's death was insufficient, but that the defendant's inaction and lack of inquiry is excusable. This court fails to find any rationale, legal or otherwise, for applying such an unequal standard when reviewing the two parties' actions.

In addition, plaintiff disingenously claims not to have had sufficient facts to pursue the matter until additional information was revealed two years later at Fisher's trial.[3] However, Mr. Wilkey's estate could have conducted an independent investigation of the matter in order to gather enough information to file a good-faith complaint in court. Plaintiff's assertion ignores the availability of the many discovery tools that a civil litigant may employ to develop a claim. At the very least a reasonably diligent person would have been aware of the need to investigate the possibility of a claim by late 1985, especially after Bedford County reopened its investigation of the

case in 1984, and the FBI commenced its investigation in 1985. Statutes of limitation are "statutes of repose, intended to require the litigation to be initiated within the prescribed time or not at all." *Shearin v. Lloyd,* 246 N.C. 363, 370, 98 S.E.2d 508, 514 (1957). The purpose of a statute of limitation is to protect the public, the plaintiff, and most importantly, the defendant. W. Ferguson, *The Statutes of Limitation Saving Statutes* 42–43 (1978).

> As a matter of fairness to the defendant, he ought to receive notice that a claim was being made against him to enable him to do what he could to guard against loss of evidence. [ ].
> Based upon this analysis, it logically appears that the primary purpose of the statutes was to protect the defendant against loss of witnesses and evidence and to protect his acts in reasonable reliance on plaintiff's inaction.

*Id.* at 42–43.

If this court were to accept plaintiff's assertions of estoppel, it would undermine this policy and contradict the well-established principle that it is the sole province of the legislature, not the judiciary, to relax the harsh results that accompany strict enforcement of the statutes of limitation. Plaintiff's "sit back and wait" approach is precisely the type of conduct that these statutes are intended to discourage and one which this court will not condone.

As a matter of law this court finds that the plaintiff was not diligent in pursuing its cause of action. In light of this finding and the lack of evidence demonstrating that the defendant engaged in fraudulent concealment, this court will not apply equitable estoppel to the expired statute of limitations.

## IV. CONTRACT CLAIM

Plaintiff's complaint also seeks one hundred thousand dollars ($100,000) in insurance proceeds from the policy purchased by Fisher. In this count of the complaint,

---

**3.** Interestingly enough, Plaintiff did not file this suit until nearly two years *after* Fisher was indicted by Bedford County. This factor further indicates Plaintiff's failure to pursue its claims with due diligence.

plaintiff seeks recovery under a breach of contract theory and under North Carolina's [4] slayer statute. N.C.Gen.Stat. §§ 31A–3(3), 31A–11 (1984). Each of these claims must be considered separately.

### A. Breach of Contract

Plaintiff alleges that Kentucky Central breached the life insurance policy by settling for twenty-five thousand dollars ($25,000) with Fisher rather than paying the original beneficiary, Wilkey's estate, one-hundred thousand dollars ($100,000).

North Carolina has a three year statute of limitations for actions arising out of contracts. N.C.Gen.Stat. § 1–52 (1983). Plaintiff's cause of action for the alleged breach of contract, i.e., the settlement with Fisher, accrued on May 18, 1984. Plaintiff failed to file within the requisite three years, because the instant case was not filed until August 31, 1988. As with the wrongful death claim, plaintiff asserts estoppel in an effort to salvage this claim. However, as discussed in Section III supra, the facts alleged by plaintiff do not support a finding by this court that the defendant should be estopped from asserting the statute of limitations defense. Defendant did not engage in fraudulent concealment or affirmative misrepresentations in an effort to prevent plaintiff from discovering the cause of action.[5]

### B. North Carolina's Slayer Statute

As is common in many states, North Carolina has enacted a statute which prohibits a person who is adjudged to be a "slayer" from receiving any property rights or insurance proceeds from the decedent's estate. N.C.Gen.Stat. §§ 31A–3 to 31A–11 (1984) (hereinafter "slayer statute"). Section 31A–3 defines a "slayer", in part, as "any person who ... shall have been convicted as a principal or accessory

before the fact of the willful and unlawful killing of another person." 31A–3(3)(a). Plaintiff argues that because Fisher was not convicted until July 15, 1987, North Carolina's three-year statute of limitations had not expired at the time this suit was filed on August 31, 1988. He concludes that under section § 31A–11,[6] the estate is entitled to the one hundred thousand dollars ($100,000) in insurance proceeds. This contention, although appealing, is incorrect.

In order for plaintiff to recover the insurance proceeds under § 31A–11 of North Carolina's slayer statute, it is evident that a valid insurance policy must have existed. However, under North Carolina law the contract between Fisher and Kentucky Central was void because it was procured through fraud. Evidence presented by both plaintiff and defendant establishes that David Wilkey's signature was forged on the insurance policy application and amendment. The North Carolina Supreme Court has held that an instrument that is fraudulently procured is void and "no right may be acquired thereunder even by innocent third parties...." Furst v. Thomas & Merritt, 190 N.C. 397, 130 S.E. 40 (1925); see also Medlin v. Buford, 115 N.C. 260, 20 S.E. 463, 463 (1894). This principle is based upon the theory that no title passes with a void instrument, thus no new legal rights can be created. M. & J. Fin. Corp. v. Rinehardt, 216 N.C. 380, 5 S.E.2d 138 (1939); Nixon v. Nixon, 260 N.C. 251, 132 S.E.2d 590 (1963). In the absence of a valid contract between Fisher and Kentucky Central, Wilkey's estate does not have an enforceable property right.

Even if this court were to conclude that a valid contract existed, plaintiff's claim under the slayer statute still fails. The public policy of the slayer statute is predicated

---

4. It is undisputed by the parties that North Carolina law applies to the contract claim because Fisher applied for the insurance policy in North Carolina. N.C.Gen.Stat. § 58–3–1 (1983).

5. In addition, plaintiff's breach of contract claim must be dismissed because the contract upon which it is based was void ab initio, as discussed infra, in Section II, B.

6. Section 31A–11 states in part:

(a) Insurance and annuity proceeds payable to the slayer:
   (1) As the beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or
   (2) In any other manner payable to the slayer by virtue of his surviving the decedent, shall be paid to the person or persons who would have been entitled thereto as if the slayer had predeceased the decedent.

upon the theory that a murderer should not profit from his own wrongdoing. *See Misenheimer v. Misenheimer*, 62 N.C.App. 706, 303 S.E.2d 415 (1983), *aff'd*, 312 N.C. 692, 325 S.E.2d 195 (1985). In order to further this policy, any insurance proceeds that the slayer would have received as a result of the homicide normally would be paid to the decedent's estate. However, an insurer does not have a duty to pay the estate until the beneficiary is adjudged a slayer within the definition of section 31A–3. If an insurance company completes a good-faith settlement with the policyholder prior to the time that the policyholder is adjudged to be a slayer, the insurer is *not* subject to additional liability. N.C.Gen. Code § 31A–11(c).

As discussed previously, Kentucky did not have sufficient information to justify refusing a payment or settlement with Fisher. The fact that Manning may have believed that Fisher was a murderer was not sufficient, in light of all the circumstances, for Kentucky to refuse Fisher payment and expose itself to legal action by Fisher.

Kentucky Central's officials undoubtedly considered the matter closed after the settlement with Fisher. It was not until late 1985, during a chance meeting between Fisher and an FBI informant, that authorities obtained evidence suggesting that Fisher was involved in Wilkey's death. On August 11, 1986, two years and two months after the settlement with Wilkey, law enforcement officials made a formal request for Kentucky Central's records. Kentucky Central complied fully and without delay to the request. Finally, on November 5, 1986, three years after Wilkey's death, Fisher was arrested and indicted for murder.

As these events demonstrate, Kentucky Central was not in any position to refuse settling or paying under the policy. The state and federal law enforcement officials, even with all of their investigative and enforcement powers, were unable to develop a case against Fisher for a number of years. In fact, it seems that success of the FBI investigation was due to a purely fortuitous meeting, between Fisher and the informant, nearly two years after the insurer's settlement. With these factors in mind, this court finds that Kentucky Central is protected from any further liability, in accordance with section 31A–11.

In summary, defendant's motion for summary judgment on the contract claims is granted because plaintiff's claim is based upon a contract that was procured by fraud, and thus, void. Additionally, Kentucky Central's settlement with Fisher entirely fulfilled its obligations under the contract and defendant is not subject to additional liability.

## V. CONSTRUCTIVE TRUST

Plaintiff's complaint also requests this court to impose a constructive trust on the proceeds of the insurance policy in favor of Wilkey's estate. Constructive trusts arise out of the existence of actual or presumptive fraud for which equity requires the transfer of beneficial title to some person other than the holder of legal title. *Leatherman v. Leatherman*, 297 N.C. 618, 256 S.E.2d 793 (1979); *Whitman v. Forbes*, 55 N.C.App. 706, 286 S.E.2d 889 (1982). There must be evidence of fraud, breach of duty, or some other wrongdoing by Kentucky Central in order to impose a constructive trust. *Williams v. Williams*, 72 N.C.App. 184, 187, 323 S.E.2d 463, 465 (1984). As previous sections of this Opinion have noted, the facts do not support a finding by this court that Kentucky Central's behavior was legally improper. Defendant correctly notes that Kentucky Central's settlement with Fisher was permissible in light of the information available at that time. *See Thompson v. Continental Assurance Co.*, 99 Ill.App.3d 303, 55 Ill.Dec. 217, 426 N.E.2d 1 (1981); 15A Couch on Insurance § 59:2 at 520 (2d ed. rev.1983). The settlement, although possibly distasteful, did not occur under any conditions, such as fraud, that require this court to exercise its equity powers by imposing a constructive trust.

## VI. UNJUST ENRICHMENT

Finally, Plaintiff's complaint alleges that Kentucky Central has been un-

justly enriched by retaining the unpaid insurance proceeds. The Restatement of Restitution articulates the broad principle that a "person who has been unjustly enriched at the expense of another is required to make restitution." Restatement of Restitution § 1 (1937). Unjust enrichment occurs when a person fails to make restitution of property or benefits when he or she had an obligation to do so. *Ivey v. Williams*, 74 N.C.App. 532, 534, 328 S.E.2d 837, 839–40 (1985). The doctrine was established in order to require the "return of, or payment for, benefits received" by the defendant. *Collins v. Davis*, 68 N.C.App. 588, 590, 315 S.E.2d 759, 761, *aff'd*, 312 N.C. 324, 321 S.E.2d 892 (1984). In the present case it is undisputed that Fisher paid Kentucky Central an insurance premium of $87.50. Defendant subsequently concluded a good-faith settlement with Fisher in which it paid him $25,000 for the release of his claim under the policy. At the time that Kentucky Central concluded the settlement with Fisher, it did not have a duty to confer with any other party. Simple mathematics reveals that defendant did not receive any enrichment from the transaction. "Without enrichment, there can be no 'unjust enrichment' and therefore no recovery on an implied contract." *Greeson v. Byrd*, 54 N.C.App. 681, 683, 284 S.E.2d 195, 196 (1981). The only party that was unjustly enriched is Mr. Fisher, but through no fault of Kentucky Central, which was exercising its legal option of settling the claim. Instead, Plaintiff's action for unjust enrichment lies against Fisher, based upon the common law principle that "no one shall be permitted to take advantage of his or her own wrong or to acquire property as a result of his or her own crime." *Garner v. Phillips*, 229 N.C. 160, 161, 47 S.E.2d 845, 846 (1948); *see also Weed*, 288 F.2d at 464.

## CONCLUSION

For the reasons stated in this Opinion, the court grants defendant's motion for summary judgment.