# Richmond

G. K. Cantrell v. Jean M. Booher, Administratrix, Etc.

March 7, 1960.

Record No. 5044.

Present, All the Justices.

The opinion states the case.

*Hugh P. Cline* and *E. D. Vicars* (*Kiser & Kiser*, on brief), for plaintiff in error.

*Bradley Roberts* (*M. M. Heuser; Stant & Roberts*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This case had its origin in a motion for judgment brought by Clyde

M. Booher, trading as Bristol-Norton Bus Lines, against G. K. Cantrell to recover the sum of $2,258.41, alleged to be due the plaintiff from the loss of the proceeds of tickets sold by Cantrell to passengers for transportation over the bus lines of the plaintiff. Cantrell denied liability on the ground that plaintiff was estopped to assert his claim because the loss was brought about by his own acts.

Pursuant to agreement of counsel, M. M. Long, Jr. was designated and appointed to try the case as judge *pro tempore*. Clyde M. Booher departed this life during the progress of the case, and the case was revived in the name of his administratrix, Jean M. Booher.

At the conclusion of all the evidence, a motion was made by each party to strike the evidence of the other. After some discussion, it was agreed by the parties that there "was no conflict in the facts of the case," the jury was discharged, and it was stipulated that "all questions of law and fact be submitted to the court for final decision." There was a judgment for the plaintiff, and upon petition of the defendant, we granted this writ of error.

The controlling facts are as follows:

Clyde M. Booher owned and operated the Bristol-Norton Bus Lines running between Bristol, Virginia, and Jenkins, Kentucky. One of the stations served by his lines was at Norton, Virginia, where a Union Bus Terminal was located. Cantrell operated and managed this terminal and a restaurant in connection therewith.

In March, 1954, or 1955, Booher entered into an oral agreement with Cantrell, whereby the latter was to act as ticket agent for Booher's company in the transportation of passengers and freight over the Bristol-Norton Bus Lines, originating at Norton. In return for his services as ticket agent and rent for the use of the terminal facilities, Cantrell was to retain 10% of the value of all tickets sold and a like percentage of all freight charges collected. Ninety percent of the total receipts collected by Cantrell was to be deposited daily in the First National Bank, Norton, Virginia, to the credit of Bristol-Norton Bus Lines. A duplicate copy of each deposit slip, endorsed by the bank, and an itemized report of the collections made, were to be forwarded daily to Booher at his office in Bristol, copies thereof being kept on file at the terminal office. A bank deposit book in the name of Bristol-Norton Bus Lines, upon which were to be entered all deposits for that company, was kept at the terminal office. Duplicate deposit slips and printed forms of ticket agent's report showing an itemized daily sale of the tickets, the price thereof, the

excise tax thereon, the freight charges collected, and commissions to which Cantrell was entitled, were furnished Cantrell.

In September, 1955, Cantrell selected and employed Miss Nell Moore to take charge of his ticket office, and charged her with the duty to sell all tickets, make all reports and deposit 90% of all money received, plus the excise tax, to the credit of the Bristol-Norton Bus Lines and 10% to his personal credit. Cantrell thought, but was not sure, that D. S. Francis, Traffic Manager for Bristol-Norton Bus Lines, had instructed Miss Moore how to make sales of the tickets, make out the reports, and deposit the funds to which his company was entitled; but Francis positively denied that he gave her any instructions relating to her duties.

Cantrell went to the terminal each morning before going to his regular work as office manager for a local motor company. He ate lunch in his restaurant there, and generally went there in the afternoon, on some days two or three times. He did not, however, check copies of deposit slips and reports on file in the ticket office, or the entries thereon.

In the later part of November, or early December, 1956, Francis went to Norton with reference to five or six delinquent reports from the bus terminal. He went to the First National Bank at Norton to check the statement of his company with the balance to its account there. While conferring with a Mr. McElroy, a bank official, the latter got the bank's teller to compare his initial signatures with those on some of the deposit slips forwarded to Booher by Miss Moore. The teller said the signatures on the latter slips were not his. Francis then went to the bus station, got Nell Moore, brought her to the bank, and asked her what she had to say about it.

In the presence of Francis and McElroy, Miss Moore said that the initial signatures on the deposit slips were not made by her; that while she was off duty for about two weeks, she had a girl working for her at the bus terminal; and "evidently" the initials were put on the slips by that girl. Francis and Miss Moore then went back to the terminal, and there he said: "Well, Nell, I am going to have to have my money before I leave." He said she replied: " 'I'll get it for you. I'll call my mother. I'll have it ready by 1:00.' " This "She did. She paid me off and I was satisfied. Before I left, she said, 'Mr. Francis, I would appreciate it if you wouldn't say anything to Mr. Cantrell about this.' I said, 'Nell, as far as I am concerned you are in charge of the station and you have made me satisfied as far as the

reports are concerned and I don't see any need to tell Mr. Cantrell about it.' "

Francis did not remember the exact amount in controversy at that time; but thought it covered four or five deposit slips averaging from $18.00 to $40.00, each of which bore a forgery of the bank teller's initials. He repeatedly testified that he was completely satisfied with Miss Moore's explanation of the shortages; that he had no reason to doubt her explanation; and did not, as a matter of fact, question it; and that he did not report the instance to Cantrell because Miss Moore was in charge of the bus station. He said that she was an efficient ticket agent, and neither he nor anyone else knew she was "crooked."

Francis, as traffic manager of the Bristol-Norton Bus Lines, was the administrative head of his company in traffic matters. He said he did not undertake to "reconcile" the bus account in the bank with the deposits supposed to have been made in the First National Bank. He had no formal commercial schooling. His company had a bookkeeping office in Bristol with one bookkeeper there.

Prior to July, 1957, Francis said he called Cantrell and also Miss Moore, at different times, about delays in making reports and requested they be sent in promptly. In July, 1957, a check for $2,-500.00, drawn by the company on its account in the First National Bank was returned unpaid because of insufficient funds. Since the reports and deposit slips sent to the bus line from the bus terminal showed that there should have been sufficient funds to the credit of the bus line to pay the check, Francis went to Norton immediately, and there advised Cantrell of the shortage. Cantrell and Francis then confronted Miss Moore with the situation, and she admitted that she was responsible for a part of the shortage. Francis then told Cantrell of the shortage in the fall of 1956.

The amount claimed by the plaintiff is not in controversy. It appeared that in January, 1957, Miss Moore forged one deposit slip of $81.88; in February one for $50.43; and in May two deposit slips totaling $345.38. In July she further forged slips of Bristol-Norton Bus Lines totaling $2,002.02, in August, two slips amounting to $118.91, and there were also shortages in deposits amounting to $159.92. The method used by Miss Moore was to make out a duplicate deposit slip, forge the initials of the receiving officer of the bank on the duplicate, forward the duplicate to Bristol-Norton

Bus Lines, with a report of the daily collections, and make an entry of the deposit of each collection in the bank book of the bus line.

Upon the promise of Miss Moore to repay the funds taken by her, Cantrell continued her in his employment. He required that in the future all deposit slips be shown him before being sent to Bristol, and that each slip bear the stamp of the bank and the initials of the receiving teller.

On August 20, 1957, Miss Moore gave Cantrell $500.00, which he deposited to the credit of the Bristol-Norton Bus Lines. He then informed Miss Moore that she would have to make up the balance of the shortage on or before August 28th. On the morning of the 29th, Miss Moore left her employment, went to the hospital, taking with her the receipts of the bus terminal for August 28th and 29th, and never returned to work. It also appeared that she embezzled funds belonging to Cantrell personally and other funds belonging to the two other bus lines operating from the terminal.

Defendant contends that the failure of the plaintiff or his agent, Francis, to promptly disclose to him the circumstances of the November-December, 1956 shortage, or to take steps otherwise to protect himself, misled him, the defendant, into continuing Miss Moore in his service, and that upon the general principles of equitable estoppel, plaintiff should be barred from a recovery of the shortage from the defendant. He argues that plaintiff and his agent, by their silence, led defendant to believe there existed a state of facts not compatible with the real situation. He relies on the principle that "when one of two innocent persons, each of whom is guiltless of an intentional moral wrong, must suffer a loss, it should be borne by the one of them who by his conduct has rendered the injury possible." *Thomasson* v. *Walker*, 168 Va. 247, 255, 256, 190 S. E. 309; *C. & O. Ry. Co.* v. *Walker, et al.*, 100 Va. 69, 91, 40 S. E. 633.

Here, the undisputed facts are not such as to support the contention of the defendant.

The evidence shows that defendant placed Miss Moore in complete control of the ticket agency; that he had such confidence in her honesty that he did not inspect the books, reports, and deposit slips, which she was charged with preparing and filing, although he had been notified on several occasions of her delay in making and sending out the reports; and that he did not, at any time, undertake to reconcile the reports and deposit slips with the bank accounts of the plaintiff or himself.

There was no charge or evidence of fraud or intent to actually deceive on the part of Francis or his principal, Booher. It is uncontradicted that Francis knew that Miss Moore was in complete charge of the ticket agency; that he believed, in good faith, her explanation of the 1956 shortage; that he did not suspect her of dishonesty; and that he had no intent to deceive or mislead the defendant.

It is generally well settled that to constitute an estoppel by silence: (1) The concealment must have been with knowledge of the true state of facts, unless the party making it was bound to know the facts, or his ignorance of them was due to gross negligence; (2) the concealment must have been made in bad faith, with the intention that the other party should be misled as to his conduct; and (3) that the other party was misled to his injury. *C. & O. Ry. Co.* v. *Walker, et al., supra*, 100 Va. pages 91 *et seq.*

Mere silence or inaction does not operate to create an estoppel. The authorities make a distinction between mere silence and a deceptive silence accompanied by an intent to defraud amounting to a positive beguilement. To operate as an estoppel there must be not only a right but a duty to speak and the person upon whom that duty rests must have an opportunity to speak and knowledge of the circumstances requiring him to speak. The silence relied on must amount to bad faith, and this cannot be based upon a transaction upon which a party has neither knowledge nor means of knowledge. As sometimes stated, for mere silence to be effective, it must appear that the person to be estopped has full knowledge of all the facts and of his rights, and intended to mislead, or at least was willing that the other party might be misled by his attitude, and in consequence thereof acted as he would not have acted otherwise. *C. & O. Ry. Co.* v. *Walker, et al., supra; Pettyjohn* v. *National Exchange Bank*, 101 Va. 111, 122, 43 S. E. 203; *Stuart* v. *Washington Realty Corp.*, 141 W. Va. 627, 92 S. E. 2d 891; *Heath* v. *Valentine*, 177 Va. 731, 738, 15 S. E. 2d 98; *Hyson* v. *Dodge*, 198 Va. 792, 799, 96 S. E. 2d 792; 7 M. J., Estoppel, § 20, pages 274, 275; 31 C. J. S., Estoppel, § 87, pages 301, *et seq.*

The rule is well stated in 19 Am. Jur., Estoppel, § 55, pages 665, 666, where it is said:

"In general, a person is required to speak only when common honesty or fair dealing demand that he do so, and in order that a party may be estopped by silence, there must be on his part an intent to mislead, or at least a willingness that others should be deceived,

together with knowledge or reason to suppose that someone is relying on such silence or inaction and in consequence thereof is acting or is about to act as he would not act otherwise."

The facts were submitted to the trial court as being without conflict. It was for it to determine whether or not Francis, as a reasonable man, believed the 1956 explanation of Miss Moore, or knew, or should have known, that she was guilty of dishonesty. The court found, after seeing and hearing the witnesses, that Francis did not know of her dishonesty, and that he was not charged with such knowledge; and, therefore, under the circumstances, was not guilty of bad faith. The decision has the same weight as the finding of a jury, and we are bound by it.

For the foregoing reasons, the judgment complained of is affirmed.

*Affirmed.*