Johnny OVERSTREET, Administrator of the Estate of David Wilkey, Deceased, Plaintiff–Appellant,

v.

KENTUCKY CENTRAL LIFE INSURANCE COMPANY, Defendant–Appellee.

No. 90–2217.

United States Court of Appeals, Fourth Circuit.

Argued April 11, 1991.

Decided Dec. 4, 1991.

---

S.D. Roberts Moore, Gentry, Locke, Rakes & Moore, Roanoke, Va., argued (Tod Wright Holliday, on brief), for plaintiff-appellant.

William Beverly Poff, Woods, Rogers & Hazlegrove, Roanoke, Va., argued (Frank K. Friedman, Leslie Edwin Hagie, on brief), for defendant-appellee.

Before BUTZNER and CHAPMAN, Senior Circuit Judges, and WILLIAMS, District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

BUTZNER, Senior Circuit Judge:

Johnny Overstreet, administrator of the estate of David Wilkey, appeals a summary judgment in favor of Kentucky Central Life Insurance Company in a diversity action alleging wrongful death, entitlement to policy proceeds under the North Carolina Slayer Statute, and unjust enrichment. The suit was brought after David Fisher, beneficiary on a policy insuring Wilkey's life, was convicted of procuring Wilkey's murder. The district court held that the company was not estopped from pleading the statute of limitations, that Fisher's fraud voided the policy, that the company was absolved from liability because it entered into a good faith settlement with Fisher, and that the company was not unjustly enriched. *See Overstreet v. Kentucky Cent. Life Ins. Co.*, 747 F.Supp. 1195 (W.D.Va.1990).

Because the record discloses genuine issues of material fact, we vacate the summary judgment on the wrongful death and Slayer Statute claims. Finding no unjust enrichment, we affirm the judgment dismissing this claim.

### I

Kentucky Central asserts that it cannot be equitably estopped from relying on the limitation applicable to the Virginia wrongful death act, Va.Code Ann. § 8.01–244 (Michie 1984), because the limitation is substantive. The district court did not adopt this theory, but the company may seek affirmance on an issue addressed in the record even though it is not the basis of the court's judgment. *Schweiker v. Hogan*, 457 U.S. 569, 585 & n. 24, 102 S.Ct. 2597, 2607 & n. 24, 73 L.Ed.2d 227 (1982).

The common law provided no cause of action for wrongful death, and this omission was remedied only by the passage of Lord Campbell's Act in 1846. The first Virginia wrongful death statute, passed in 1871, was modeled on Lord Campbell's Act. *Wilson v. Whittaker*, 207 Va. 1032, 1035, 154 S.E.2d 124, 127 (1967). Under this and successor statutes, "a new right of action is given decedent's personal representative only through the grace of legislative enactment." 207 Va. at 1036, 154 S.E.2d at 127. When the legislature creates a right of action that did not exist at common law, the limitations specified in the statute operate as a substantive limit on the right to recover. *Continental Casualty Co. v. The Benny Skou*, 200 F.2d 246, 248 (4th Cir.1952); *Dowell v. Cox*, 108 Va. 460, 465, 62 S.E. 272, 273 (1908). This distinction—often called that between a remedial or procedural statute of limitations and a substantive statute—is easier to state than to justify in the context of estoppel. Some authorities have held that a substantive limitation extinguishes the plaintiff's right to sue at the expiration of the specified time regardless of any equitable considerations, *see* 2 Stuart M. Speiser, *Recovery for Wrongful Death 2d* § 11:24 (2d ed. 1975 & Supp.1990), but this text also notes that equitable estoppel is a valid defense to the plea of the statute of limitations in Virginia, § 11:24 at 147 (2d ed. Supp.1990). Moreover, the mechanistic distinction between the types of limitations has been falling into disfavor for at least 50 years. In *Scarborough v. Atlantic Coast Line R.R. Co.*, 178 F.2d 253 (4th Cir.1949), we held that the distinction should not bar an action under the Federal Employers' Liability Act where the plaintiff had been induced by fraud to permit the limitations period to expire:

> We cannot see a distinction and a difference, so clear and so real, between the two classes of statutes of limitations—the remedial and the substantive—as to justify the courts in fully giving effect to fraud in tolling the statute of one type (remedial) and then flatly denying that effect to fraud in the other type (substantive). The ancient maxim that no one should profit by his own conscious wrong is too deeply embedded in the framework of our law to be set aside by a legalistic distinction between the closely related types of statutes of limitations.

178 F.2d at 259.

The United States Supreme Court has held that a "substantive" statute of limitations is nonetheless tolled by the principle of equitable estoppel, which it noted was "older than the country itself." *Glus v. Brooklyn Eastern Terminal*, 359 U.S. 231, 234, 79 S.Ct. 760, 763, 3 L.Ed.2d 770 (1959). The Supreme Court noted elsewhere:

> [T]he fact that the right and limitation are written into the same statute does not indicate a legislative intent as to whether or when the statute of limitations should be tolled. Thus, the "substantive"-"procedural" distinction would seem to be of little help in deciding questions of extending the limitations period.

*Burnett v. New York Central R.R. Co.*, 380 U.S. 424, 427 n. 2, 85 S.Ct. 1050, 1054 n. 2, 13 L.Ed.2d 941 (1965). More than 20 years ago, we noted that "[e]ven when the time limitation is fixed by the same statute which creates the cause of action, the modern trend is to extend or toll the period of limitations to avoid injustice." *Belton v. Traynor*, 381 F.2d 82, 86 (4th Cir.1967). *See also* 4 Fowler & Harper, et al., *The Law of Torts* § 24.7 at 483–84 (Oscar S. Gray ed. 1986).

In 1926, the Virginia Supreme Court applied equitable tolling to the state's Workmen's Compensation Act, even though the statute contained a substantive limitations clause. The court rejected the distinction between types of statutes as precluding tolling:

> Independently of statutes of limitation, or of jurisdiction as determined by statutes fixing the time within which applications for hearing shall be filed, in a court of equity, when one by his acts, or by his silence or through culpable negligence induces another to believe certain facts to exist, and such other rightfully relies and acts upon such belief, so that he will be prejudiced if the former is permitted

to deny the existence of such facts, estoppel arises.

*American Mut. Liab. Ins. Co. v. Hamilton,* 145 Va. 391, 403, 135 S.E. 21, 24 (1926).

The District Court for the Eastern District of Virginia applied these principles to the Virginia wrongful death statute and held that equitable estoppel would toll that statute. *Beverage v. Harvey,* 456 F.Supp. 1044, 1046 (E.D.Va.1978), *aff'd on other grounds,* 602 F.2d 657 (4th Cir.1979).

Kentucky Central mistakenly relies on *Dodson v. Potomac Mack Sales & Service, Inc.,* 241 Va. 89, 400 S.E.2d 178 (1991), for the proposition that the wrongful death limitation cannot be tolled. *Dodson* dealt with the conflict between the general tolling statute for nonsuits and the specific tolling statute for the abatement of a wrongful death action, holding that the general statute did not apply to wrongful death actions. 241 Va. at 95, 400 S.E.2d at 180–81. *Dodson* had nothing to do with equitable estoppel or fraudulent concealment, and its language cannot be read out of context to bar equitable tolling.

In *American Mutual,* the Virginia Supreme Court rejected an argument similar to Kentucky Central's, saying that an earlier opinion describing the wrongful death limitations as substantive and consequently subject to demurrer was not authority for denying the tolling of a similar substantive limitation in the Workmen's Compensation Act. The Court aptly observed that the earlier wrongful death case did not "deal with the question of legal fraud and estoppel." 145 Va. at 404, 135 S.E. at 25.

The rule of *American Mutual* and *Beverage* applies here, and we hold that the limitations provision of the Virginia Wrongful Death Act is subject to tolling by equitable estoppel or fraudulent concealment. To deny tolling would lead to unjust results. For example, denial would enable a murderer to escape civil liability by concealing his identity or the nature of his crime until the expiration of the period of limitations.

## II

■ An insurance company has "the duty to use reasonable care not to issue a policy of life insurance in favor of a beneficiary who has no interest in the continuation of the life of the insured." *Liberty Nat'l Life Ins. Co. v. Weldon,* 267 Ala. 171, 185, 100 So.2d 696, 708 (1957). Breach of the duty is the proximate cause of the death of the insured if the trier of fact finds that this result was reasonably foreseeable. *Weldon,* 267 Ala. at 188–89, 100 So.2d at 709–11; *accord Ramey v. Carolina Life Ins. Co.,* 244 S.C. 16, 26–27, 135 S.E.2d 362, 367–68 (1964). The same principles apply to a change of beneficiary. *Bacon v. Federal Kemper Life Assurance Co.,* 400 Mass. 850, 855, 512 N.E.2d 941, 944 (1987) (dictum).

On September 14, 1983, David Fisher met with Kenneth Tietsort, a Charlotte insurance agent who represented Kentucky Central, to procure insurance on the life of David Wilkey, Fisher's 18–year–old employee. Fisher applied for a $50,000 life insurance policy on Wilkey, with provision for an additional $50,000 in coverage in case of accidental death. Tietsort, in violation of company policy, accepted the application even though he knew Fisher had no insurable interest in Wilkey's life. Tietsort certified that he had witnessed Wilkey's signature on the application, that he had known Wilkey for a month, and that Fisher was Wilkey's guardian.

On September 22, Kentucky Central disapproved the application because of Fisher's lack of an insurable interest. Tietsort, however, suggested to Fisher that Wilkey's estate could be named as beneficiary for purposes of approval and that Fisher could be designated as beneficiary after the policy was approved. Once again, Tietsort signed as having witnessed Wilkey's signature on the amended application. On September 27, Kentucky Central issued the policy, naming Fisher as the owner of the policy and Wilkey's estate as beneficiary. Fisher and Tietsort promptly began the process of designating Fisher as the beneficiary, and the change was approved on October 24. Whether Tietsort truthfully

certified that he witnessed Wilkey's signatures is questionable because of Tietsort's conflicting statements.

On November 21, Fisher lured Wilkey to rural Bedford County, Virginia, on the pretext of a hunting trip, where Robert Mulligan, another employee of Fisher's shot him in the back, killing him. The death was reported as a hunting accident.

On January 9, 1984, Fisher filed a claim for $100,000. Tietsort first told the independent investigator whom the company had hired that he saw Wilkey when the applications were signed. Later he changed his statement, admitting that he had not seen Wilkey then. He later testified, however, that he saw Wilkey when the form for the change of beneficiary was signed. He described the man he saw, but Wilkey's mother averred that this description does not fit Wilkey. The company's investigator, after conducting a follow-up investigation of Tietsort, reported to the company: "I would like to stress that your agent, Kenneth Darren Tietsort, has not ever seen David William Wilkey." The investigator repudiated his report when he testified, stating that he meant that Tietsort had not seen Wilkey when Fisher applied for the insurance.

The company ignored two letters from Wilkey's mother, who requested information about the policy and furnished evidence about Fisher's actions after Wilkey's death. Despite a written request, the company declined to furnish documentary information from its file to the Commonwealth's Attorney of Bedford County. On May 18, 1984, it settled with Fisher for $25,000.

In 1986, the Federal Bureau of Investigation learned that Fisher had revealed to an informant his role in Wilkey's death. The FBI then obtained the company's file. As a result, Fisher was convicted of the murder in 1987 and sentenced to death. *See Fisher v. Commonwealth*, 236 Va. 403, 418, 374 S.E.2d 46, 55 (1988).

Within two years after Fisher's conviction, Wilkey's administrator brought this action against Kentucky Central. Wilkey died on November 21, 1983. Fisher was indicted on November 5, 1986, and convicted on July 15, 1987. The administrator brought this action on August 3, 1988. Thus, nothing else appearing, the wrongful death action would unquestionably be time barred by Virginia's two-year statute.

### III

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). It is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), nor is it appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979) (quoting *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.1951)). Where the party opposing summary judgment would have the burden of proof at trial, that party is entitled

> to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Charbonnages*, 597 F.2d at 414. Where states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie. *Charbonnages*, 597 F.2d at 414. Summary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the elements necessary to his or her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A party seeking summary judgment has the initial burden of showing the information that it believes demonstrates absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. We review the summary judgment de novo, applying the same standard as that applied by the district court. *Felty v. GravesHumphreys Co.,* 818 F.2d 1126, 1127–28 (4th Cir.1987).

The elements of equitable estoppel in Virginia are: (1) misrepresentation or concealment of a material fact, (2) made with knowledge of the true state of facts (3) to a party ignorant of the truth of the matter misrepresented or concealed and (4) with the intention that the other party should act in reliance upon it, and (5) which does induce the other party to act on it, (6) to the injury of the relying party. *Beverage v. Harvey,* 602 F.2d 657, 659–60 (4th Cir.1979); *American Mut. Liab. Ins. Co. v. Hamilton,* 145 Va. 391, 407–08, 135 S.E. 21, 25–26 (1926). Equitable estoppel and fraudulent concealment are similar, although equitable estoppel does not require proof of fraud. *Barry v. Donnelly,* 781 F.2d 1040, 1042–43 (4th Cir.1986). Wilkey's administrator has the burden of proving equitable estoppel by "clear, precise and unequivocal evidence." *Employers Commercial Union Ins. Co. v. Great Am. Ins. Co.,* 214 Va. 410, 415, 200 S.E.2d 560, 564 (1973). In *Employers,* this burden was satisfied by evidence that an insurance company through its silence and inaction led its insured to believe he had coverage. 214 Va. at 415, 200 S.E.2d at 564.

## IV

The crux of this controversy is the dual role the company's agent played. Tietsort's conduct in issuing the policy and facilitating the change of beneficiary exposed Kentucky Central to liability for negligently changing the beneficiary. Tietsort knew Fisher was paying half the premiums. But by naming Fisher the policy owner, Tietsort enabled Fisher to change the beneficiary without Wilkey's knowledge or consent. Tietsort's conduct also furnished a motive for Fisher by enabling him to profit from Wilkey's murder. The company was well aware of the dual aspect of its agent's activity, which officers of the company described as a "dilemma"—divulging information about Fisher's motive would result in subjecting the company to liability to Wilkey's estate. A memorandum disclosed a company officer's analysis of the situation as follows:

> We have a dilemma in this death claim in which the company could be forced to pay the $100,000 claim to the beneficiary, and still be exposed to liability in the millions for wrongful issue of the policy.
>
> \* \* \* \* \* \*
>
> The local prosecutor has just recently reopened a criminal investigation upon learning of the life insurance, and has asked for a copy of our file. While his subpoena powers do not reach us here in Kentucky, he might obtain the file from our investigator who happened to have it in hand while looking into the case in Roanoke, or the insurance departments of either Virginia or North Carolina could force us to produce it. The dilemma arises in that while we might like to prove that Fisher had the insured killed (thereby disqualifying him from recovery) the insured's father and mother would then have a good tort claim against the company. Unless we could have the policy declared void for fraud, we would still have to pay the insured's estate the policy benefits.

Consequently the company purposely withheld the information it alone possessed about the policy.

To establish estoppel, Wilkey's administrator points to three actions by Kentucky Central: its silence when Wilkey's mother sought information, its temporizing response to the Commonwealth's Attorney, and its payment of $25,000 to Fisher in settlement of a claim it had cause to suspect was false and felonious. Proof at trial that any one of these actions was taken to conceal facts of which the company was aware, coupled with proof of the other elements of estoppel, would be sufficient to estop Kentucky Central from relying on the statute of limitations.

In rebuttal, Kentucky Central argues that it owed no duty to speak to Wilkey's mother or the Commonwealth's Attorney. It argues that under the circumstances

"mere silence" cannot be the basis for equitable estoppel or fraudulent concealment. It asserts that its settlement with Fisher was appropriate and was made in good faith.

### A

▅ The company's argument that as a matter of law it owed no duty to Wilkey's mother rests on the premise that she had no interest in the policy. But this premise can only be validated by resolving all disputed facts and inferences in favor of the company, contrary to the principles governing summary judgment. Tietsort claims Wilkey gave his consent to naming Fisher the beneficiary. But according to an affidavit Wilkey's mother filed, the man Tietsort described as Wilkey did not look like Wilkey. If Tietsort's certifications to the company were truthful, and if the man described by Tietsort when the change of beneficiary was made was not Wilkey, Wilkey's mother would have an interest in the policy. But these disputed facts cannot be resolved in favor of the company at this stage of the proceedings. If Wilkey's mother had an interest in a valid policy issued to Wilkey's estate, her interest could not be defeated by a fraudulent change of beneficiary in which the company's agent knowingly participated. If the trier of fact resolves the facts and inferences drawn from them in favor of Wilkey's mother, she had an interest in the policy on her son's life and the company owed her the duty to respond to her questions about her son's signature and Fisher's claims.

▅ At least one Virginia case, by implication, recognized an insurance company's duty to inform an insured about the status of his policy. Breach of the duty by silence and inaction estopped the company from relying on its insured's false answers to deny him coverage. See *Employers Commercial Union Ins. Co. v. Great Am. Ins. Co.*, 214 Va. 410, 200 S.E.2d 560 (1973). As a practical matter, after the death of an insured, a potential beneficiary has an interest in the policy as significant as that of the insured in *Employers*. Relying by analogy on *Employers*, we conclude that a

company has a duty to furnish information about a policy to a potential beneficiary unless the company has reasonable grounds for withholding the information. The reasonableness of Kentucky Central's refusal to respond to Wilkey's mother raises a question for the jury.

▅ Contrary to Kentucky Central's position, Virginia has long recognized that "even silence" can trigger estoppel. See *Chesapeake & O. Ry. Co. v. Walker*, 100 Va. 69, 91, 40 S.E. 633, 641 (1902). In *Cantrell v. Booher*, 201 Va. 649, 112 S.E.2d 883 (1960), the court quoted with approval the following principle of law:

In general, a person is required to speak only when common honesty or fair dealing demand that he do so, and in order that a party may be estopped by silence, there must be on his part an intent to mislead, or at least a willingness that others should be deceived, together with knowledge or reason to suppose that someone is relying on such silence or inaction and in consequence thereof is acting or is about to act as he would not otherwise.

201 Va. at 645, 112 S.E.2d at 887. Whether Kentucky Central's intent and knowledge entitle the administrator to the benefit of this principle presents a question for the jury. See *Charbonnages*, 597 F.2d at 414.

▅ Further, we believe there is a jury question whether the company owed a duty to Wilkey's mother, as a potential beneficiary or distributee of the proceeds of the policy, to apprise her of the facts necessary to perfect her claim. It is true that at the time the company declined to furnish Wilkey's mother the information she sought, Fisher had not been convicted. But the Slayer Statute did not extinguish the principles of the common law in North Carolina. When proof by a preponderance of the evidence discloses that a beneficiary caused the death of an insured, the common law bars the beneficiary from recovering the proceeds even in the absence of a conviction. *Jones v. All Am. Life Ins. Co.*, 312 N.C. 725, 728, 325 S.E.2d 237, 239 (1985). A beneficiary can be barred from receiving the proceeds upon proof of culpa-

ble negligence that caused the death of the insured. *Quick v. United Benefit Life Ins. Co.*, 287 N.C. 47, 213 S.E.2d 563 (1975). When a beneficiary is barred from receiving proceeds by reason of involvement in the death of the insured, the proceeds by common law become payable to the administrator of the insured's estate unless the policy provides otherwise. *Bullock v. Expressmen's Mut. Life Ins. Co.*, 234 N.C. 254, 258, 67 S.E.2d 71, 75 (1951). *See also Restatement of Restitution* § 189 cmt. a (1937). Cases in other jurisdictions have described this situation as imposing a trust on the insurer for the benefit of the insured's estate. *National Life Ins. Co. v. Hood's Adm'r*, 264 Ky. 516, 522, 94 S.W.2d 1022, 1025 (1936). *Accord Johnston v. Metropolitan Life Ins. Co.*, 85 W.Va. 70, 73, 100 S.E. 865, 867 (1919).

An insurer faced with potential conflicting claims by a possible slayer and the insured's estate may absolve itself of excess liability by paying the proceeds into the registry of the court and filing an action in interpleader to determine the proper recipient. *See, e.g., Prudential Ins. Co. v. Tull*, 690 F.2d 848, 849 (4th Cir.1982). In these circumstances, we believe that a jury might conclude that, at the time the company received Wilkey's mother's letter, it had sufficient facts in its possession to alert it to its duty to preserve the proceeds of the policy and cooperate with her to establish its proper liability under the contract. Under these circumstances, the company's silence would constitute an act of concealment.

Wilkey's mother stated in an affidavit that she did not learn about the payment to Fisher until his criminal trial. Had she known about the payment and the other facts relevant to the issuance of the policy and change of beneficiary disclosing Fisher's motive, she would have brought this lawsuit many years before. At this stage of the proceedings, we must credit her affidavit.

### B

■ Kentucky Central was not content to rely on silence when the Commonwealth's Attorney sought information well within the limitations period. Instead, the company told the Commonwealth's Attorney that "privacy laws" prohibited it from furnishing him the information he sought. The company has cited no privacy laws to which it referred, and the administrator asserts that none exist. The company's explanation that it had a good faith belief that it should protect Fisher's privacy, and the administrator's charge that the excuse of "privacy laws" was a ploy to divert the Commonwealth's Attorney's inquiry, raise a genuine issue of material fact. This is readily apparent from a note written by a company officer observing that the Commonwealth's Attorney did not understand that "the more we implicate Fisher in the killing, the more we could be liable to heirs for tort based on improper issue of the policy." If the facts as developed at trial show that Kentucky Central's claim of privacy laws was not its real reason for withholding information, the company committed an affirmative act. Affirmative acts in the context of estoppel take many forms. *See Chesapeake & O. Ry. Co. v. Walker*, 100 Va. 69, 91, 40 S.E. 633, 641 (1902). An affirmative act done to prevent another from learning of a fact constitutes concealment amounting to misrepresentation. *See Restatement (Second) of Contracts* § 160 (1979). Assertion of the existence of a fact constitutes "a misrepresentation if the fact does not exist." *Restatement (Second) of Torts* § 525(b) (1976). In short, Kentucky Central, having elected to speak to the Commonwealth's Attorney, was required not to mislead him. *See* W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* 737–38 (5th ed. 1984).

The Commonwealth's Attorney stated in an affidavit that because of the company's refusal to cooperate he was unable to proceed further in 1984 with his investigation of Wilkey's death. He also stated that the information that had been suppressed by the company was ultimately very important in obtaining Fisher's conviction. The Supreme Court of Virginia took note of this situation, saying: "In 1984, the Commonwealth's Attorney of Bedford County had undertaken an investigation of the killing,

but had been unable to proceed further because of the insurance company's refusal to cooperate." *Fisher v. Commonwealth,* 236 Va. 403, 409 n. 1, 374 S.E.2d 46, 50 n. 1 (1988).

 Given the credence to which it is entitled at this stage of the proceedings, the affidavit of the Commonwealth's Attorney establishes that Kentucky Central's concealment of information induced him to take no action, to his detriment and that of the public and Wilkey's estate. "[W]hen one has lulled another into inaction to his detriment, the latter may invoke estoppel against the former." *Lataif v. Commercial Industr. Constr., Inc.,* 223 Va. 59, 64, 286 S.E.2d 159, 161 (1982).

### C

The district court characterized Kentucky Central's settlement with Fisher as "a good-faith settlement payment to the beneficiary of record." 747 F.Supp. at 1199. The company argues that it paid the settlement because "it was unable to uncover any evidence which would allow it to deny Fisher's claim on the theory that Wilkey was murdered." Br. of Appellee at 28. Wilkey's administrator characterizes the payment as "in effect, 'hush money.'" Br. of Appellant at 33.

 Fisher threatened to sue the company or take his complaint to the insurance commissioner, and the company resolved to settle his claim. It engaged an outside attorney to evaluate the claim and conduct settlement negotiations. A company official stated in a memo that the attorney "strongly feels" that Fisher had Wilkey murdered. The attorney recommended that the company settle with Wilkey's parents and then "cooperate 100%" with the Commonwealth's Attorney to "nail Fisher and Mulligan." The attorney also said that he had consulted with attorneys at Pilot Life Insurance Company, where he formerly had been general counsel, and that they agreed.

The company rejected its attorney's advice and directed him to settle with Fisher by a payment of not more than $25,000.

The attorney confronted Fisher with facts that indicated murder, and Fisher accepted $25,000 in full settlement, stating that he would deposit the money in a bank account under another person's name.

We cannot agree with the district court that as a matter of law the settlement with Fisher was made in good faith. If, as the administrator contends, the settlement was made to conceal information from Wilkey's mother and the Commonwealth's Attorney about the issuance of the policy and change of beneficiary, it was an affirmative act of concealment.

A case in point is *Thompson v. Continental Assurance Co.,* 99 Ill.App.3d 303, 55 Ill.Dec. 217, 426 N.E.2d 1 (1981), which concerned an insurance company that paid policy proceeds to a beneficiary whom it knew police suspected of murdering the insured. The Illinois Court of Appeals held that such payment did not amount to bad faith as a matter of law. 99 Ill.App.3d at 305, 55 Ill.Dec. at 218–219, 426 N.E.2d at 2–3. Bad faith, which could be shown if "prudent investigation would have uncovered facts which would have defeated the beneficiary's claim," remained an "open question" for the jury despite the company's plea that it had paid the proceeds to the named beneficiary. If the payment was made in bad faith, the court held, the company would remain liable to the victim's heirs for the full policy amount. 99 Ill.App.3d at 305, 55 Ill.Dec. at 219, 426 N.E.2d at 3. Here, too, it is properly a jury question whether Kentucky Central acted in good faith when it settled with Fisher.

### D

 There remains the issue whether Wilkey's estate, and particularly Wilkey's mother, as a matter of law failed to pursue their claim with due diligence. Due diligence has been defined as:

"Such a measure of prudence, activity or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case."

... Whether such due diligence has been exercised must be ascertained by an examination of the facts and circumstances unique to each case.

*STB Marketing Corp. v. Zolfaghari*, 240 Va. 140, 144–45, 393 S.E.2d 394, 397 (1990) (citation omitted). Plaintiffs will not be held wanting in diligence where defendants' "conduct concealed the true nature of their fraudulent acts." 240 Va. at 145, 393 S.E.2d at 397. However, due diligence is not shown by "[m]ere 'informal contacts'" with governmental authorities if the information is readily available through "routine methods," *Dennis v. Jones*, 240 Va. 12, 19, 393 S.E.2d 390, 393–94 (1990), nor by an "unpursued inquiry," *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219 (4th Cir.1987).

■ We must take into account the circumstances of Wilkey's mother in the months following his murder. She had little information and few financial resources, and she lived far from the scene of the murder and the offices of Kentucky Central. Nonetheless, she wrote twice to the company asking for relevant information. She gathered highly suggestive evidence in the form of a letter from Wilkey's girlfriend and made it available to the company. She convinced the local prosecutor to reopen his investigation into the hunting "accident." Through no fault of hers, the Commonwealth's Attorney was frustrated by the company's response to his request for help. Wilkey's administrator brought suit in timely fashion after Fisher's trial revealed the facts giving rise to this claim.

It is no simple task to investigate either a murder or the acts of an insurance agent who changed a policy on the insured's life under questionable circumstances to name the murderer the beneficiary. The task is exceedingly difficult when the person charged with using diligence lives far away with limited resources. A mother whose son has been killed may of necessity and common sense seek assistance from the company that insured her son's life and the public official charged with the investigation and prosecution of crime. Whether Wilkey's mother acted prudently and reasonably is a question for the jury.

In sum, we conclude that Wilkey's administrator presented a triable claim of estoppel. *See Charbonnages*, 597 F.2d at 414.

## V

■ Wilkey's administrator also asserts a claim to the proceeds of the insurance policy pursuant to the North Carolina Slayer Statute, N.C.Gen.Stat. § 31A–11 (1984). North Carolina law is applicable because the policy was issued there. The parties are in agreement, and the district court held, that the proceeds of an insurance policy on the life of the victim that the slayer would have received are payable to the victim's estate.

Kentucky Central asserts that the claim is barred by the three-year statute of limitations applicable to contracts and that this limitation is not tolled by the Slayer Statute.

The district court granted summary judgment, ruling that North Carolina's three-year statute of limitations applicable to contracts barred Wilkey's administrator from recovering the proceeds. It also ruled that the policy was procured by fraud and that the company's good faith settlement with Fisher absolved the company from further liability on the policy. 747 F.Supp. at 1201–02.

For reasons stated in the discussion of estoppel with respect to the action for wrongful death, whether Kentucky Central is estopped from relying on the three-year statute of limitations presents a question for a jury. Genuine issues of material fact preclude summary judgment.

■ Additionally, a slayer is defined as a person convicted of willful and unlawful killing of a person, N.C.Gen.Stat. § 31A–3(3)a (1984), or who under circumstances not relevant to this case dies before conviction, § 31A–3(3)d. By its definition of a slayer, the statute tolls the three-year statute of limitations until the slayer is convicted. Since the administrator filed this action within two years after Fisher's convic-

tion, the action brought pursuant to the Slayer Statute is not barred by limitations.

The district court held that the policy was void because it was procured by fraud. The court found that Wilkey's signatures were forged on the application and amended application. The court relied on the undisputed proposition that an instrument procured by fraud is void. *See Furst v. Thomas & Merritt,* 190 N.C. 397, 402, 130 S.E. 40, 43 (1925).

In support of the district court's ruling, Kentucky Central points out that Wilkey's mother gave an affidavit that the signatures on the insurance papers were not her son's. To augment its argument that the administrator is conclusively bound by the affidavit of Wilkey's mother, the company relies on *Computer Servicenters, Inc. of Greenville v. Beacon Mfg. Co.,* 443 F.2d 906 (4th Cir.1971).

There are several difficulties with Kentucky Central's position. *Computer Servicenters* is not dispositive. That case stands for the proposition that when a district court accepts all of a plaintiff's evidence to decide a motion for summary judgment, the judgment will be affirmed if the assumed facts demonstrate that the plaintiff cannot recover as a matter of law. 443 F.2d at 906–07. *Computer Servicenters* dealt with the plaintiff's evidence; Wilkey's mother, however, is not the plaintiff, and her statement cannot conclusively bind the administrator, who is the plaintiff. The second reason for rejecting the company's position is that the company introduced evidence that its handwriting expert decided "with some assurance" that Wilkey's signature on the application was genuine. The expert ventured the opinion that the signature on the amended application was forged but said she could not "declare absolutely" that this signature was forged. Another expert said that the signature on the application was genuine. It is therefore impossible to say that as a matter of law the administrator is barred from recovery on the ground that Wilkey's signatures are forgeries.

The administrator's complaint alleges that only the signature on the change of beneficiary is forged. The evidence on this issue—as previously shown—is also in conflict, and the district court did not address it.

The third reason why the policy cannot be held void as a matter of law rests on a well-established principle of North Carolina law. An insurer may be estopped from pleading fraud or falsity in the making of an insurance contract "where such fraud or negligence was on the part of the insurer's agent." *Mathis v. Minnesota Mut. Life Ins. Co.,* 302 F.Supp. 998, 1004 (M.D.N.C.1969). *See also Northern Nat'l Life Ins. Co. v. Lacy J. Miller Machine Co.,* 311 N.C. 62, 74, 316 S.E.2d 256, 264 (1984). Conflicting statements concerning the extent of such misconduct create a jury issue that must survive a motion for summary judgment. *Southeastern Asphalt and Concrete Co. v. American Defender Life Ins. Co.,* 69 N.C.App. 185, 190–91, 316 S.E.2d 311, 314 (1984).

Here, Tietsort and the company's investigators have told multiple conflicting stories concerning when and where Tietsort saw Wilkey and whose signatures are on the application and the change of beneficiary form. These conflicts in the evidence and the differences concerning the signatures create a jury issue with respect to the validity of the policy.

In addition, an insurer that has discovered facts permitting it to void a policy may be estopped from pleading those facts if it has engaged subsequently in conduct apparently incompatible with an intention to void the policy, such as acceptance and retention of premiums. *Hicks v. Home Sec. Life Ins. Co.,* 226 N.C. 614, 617, 39 S.E.2d 914, 916 (1946). Such conduct also may include negotiations for a settlement. *See* 16C John Alan Appleman, *Insurance Law and Practice* (Rev.Ed.1981) § 9253 at 337.

The North Carolina Slayer Statute provides in part:

Any insurance or annuity company making payments according to the terms of its policy or contract shall not be subjected to additional liability by the terms

of this chapter if such payment or performance is made without notice of circumstances tending to bring it within the provisions of this Chapter.

N.C.Gen.Stat. § 31A–11 (1984). Kentucky Central did not make "payment according to the terms" of Wilkey's policy. Whether the company's payment of a part of the face value of the policy satisfies the statute has not been addressed by the district court or briefed by the parties. It is a question that remains open for resolution on remand.

Whether the company had notice of circumstances described by the Slayer Statute as simply "tending to bring" the payment within the provisions of the statute cannot be decided as a matter of law on summary judgment. Without reciting all the circumstances surrounding the payment, it is enough to note the company's attorney reported before settlement that he "strongly feels that Fisher had Wilkey murdered." This evidence and other circumstances leading up to the settlement must be submitted to a jury in order to determine whether the company is precluded by the statute from relying on its settlement with Fisher. *Cf. Thompson v. Continental Assurance Co.,* 99 Ill.App.3d 303, 55 Ill.Dec. 217, 218–219, 426 N.E.2d 1, 2–3 (1981).

## VI

 The administrator's cause of action against the company for unjust enrichment must fail. A claim for unjust enrichment is not grounded in the plaintiff's damages but in the law's unwillingness to permit the defendant to retain benefits to which defendant is not entitled. *See* Dan B. Dobbs, *Handbook on Remedies* § 4.1 at 224 (1973). In other words, without enrichment of defendant by the plaintiff, the plaintiff has no claim. *Greeson v. Byrd,* 54 N.C.App. 681, 683, 284 S.E.2d 195, 196 (1981). In this case, as the district court notes, the company received only one premium payment from Fisher of $89.50. Accordingly, there was no enrichment of the company by Wilkey or his estate.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.