Mitsue **LISTAK, Personal Representative of the Estate of Charles A. Listak, Plaintiff,**

v.

The **CENTENNIAL LIFE INSURANCE COMPANY, Defendant.**

C/A No. 2:96–2260–18.

United States District Court, D. South Carolina, Charleston Division.

Aug. 27, 1997.

Michael Moore, Summerville, SC, for Plaintiff.

William M. Grant, Jr., Judith A. Leatherwood, James A. Patrick, III, Greenville, SC, for Defendant.

## ORDER

NORTON, District Judge.

This action is before the court on Defendant's Motion for Summary Judgment and to Strike. For the reasons set forth below, the court grants Defendant's motion.

## I. PROCEDURAL HISTORY

Plaintiff filed this complaint in the Court of Common Pleas on July 10, 1996, for the following causes of action: (1) breach of contract; (2) bad faith insurance practice; (3) breach of contract accompanied by a fraudulent act; and (4) negligent misrepresentation. On July 29, 1996, Defendant removed the action to this court. In its answer filed August 2, 1996, Defendant brought a counterclaim seeking a declaratory judgment that "it has no contractual relationship with the Plaintiff[.] However, should the finder of fact determine that there exists a dispute of fact as to that issue, then Defendant alleges and would show that the Plaintiff's deceased was guilty of fraud and made material misrepresentations as to his medical history and condition which would be sufficient to void any contract which may have existed between the parties." (Answer, ¶ 56 at 11).

## II. BACKGROUND

Plaintiff's Decedent Charles A. Listak ("Listak") retired from his employment with Bosch Automotive Company in 1993. He then sold insurance for Metropolitan Life Insurance Company from 1993 to 1994, for Jefferson Pilot Life Insurance Company from 1994 to 1995, and for Pioneer Life Insurance Company in 1995.

In March of 1995, Listak began training to sell products for the Centennial Life Insurance Company ("Centennial"). Centennial offers certain products which are marketed through Pinnacle Benefits Group ("Pinnacle"). Listak entered into a Pinnacle Material and Processing Agreement, a Pinnacle Sales Representative's Contract, and a Centennial License Agreement. During Listak's training, he was required to review documents including the Producer's Guide, which informed agents that all applicants would have a Medical Information Bureau ("MIB") [1] report generated, and that all applicants must be reviewed and approved by Centennial. (Ex. E,[2] at 2). The document states that agents should stress to applicants the importance of making correct applications, and includes the following legend:

SUBMISSION OF AN APPLICATION AND INITIAL PREMIUM DOES NOT GUARANTEE ACCEPTANCE. A LETTER CONFIRMING CENTENNIAL'S APPROVAL WILL BE FORWARDED TO THE GENERAL AGENT AS COVERAGE IS APPROVED. A GROUP SHOULD NOT DROP THEIR PRESENT COVERAGE UNTIL THE CONFIRMING LETTER IS RECEIVED.

(Ex. E).

On March 10, 1995, Listak applied for and was issued a one-month major medical policy from Central States of Omaha ("CSO"), one of the companies for which Listak was authorized to sell insurance. Listak subsequently applied for and was issued another one-month policy, from April 10 through May 10.

On April 8, 1995, Listak completed an application for a Centennial MedProtect One policy. Listak was an authorized agent for Centennial at the time of his application. Listak completed the application in his own hand, and signed as both applicant and agent. In doing so, Listak answered a number of health history questions. Listak then signed two statements, in his capacities as applicant and agent. The Applicant's statement read as follows:

I declare that I have completely read the application and answered all questions. I agree that statements in this application are true to the best of my knowledge and belief, and they shall form a part of any certificate of insurance which is issued. The insurance requested in the Application will not be effective until approved by the company. Any misstatements or omission of information made on this application form may be the basis for later rescission of my Insurance coverage. Rescission voids my coverage. No payments will be made for any claims submitted, whether or not the treatment was related to the condition for which information was omitted or misstated. . . .

(Ex. II).

Listak then forwarded the application to Michael O. Benke ("Benke"), who had personally trained Listak to be an agent for Centennial. Benke filled in some missing information, but did not meet with Listak concerning the policy, did not help Listak fill out the application, and did not act as an agent for that particular application. Benke testified that his sole involvement with Listak's application, other than filling in two missing telephone numbers and a zip code, was to forward the application to Pinnacle. (Ex. C). Listak also submitted payment to Centennial for the first three months of coverage.

Plaintiff alleges that Benke promised Listak that his insurance policy would be active in approximately one month's time from the April 8, 1995 date on which Listak applied for coverage, and that otherwise, Listak

---

**1.** The Medical Information Bureau is an organization that exchanges medical information with member insurance companies. (Ex. V, at 10).

**2.** All exhibits cited by the court are those submitted with Defendant's Memorandum in Support of its Motion for Summary Judgment.

would be notified before that time in writing of the Defendant's denial of the application. Plaintiff asserts that Listak did not misrepresent or give any false statements concerning his medical condition when he applied for insurance coverage.

On April 11, 1995, the Centennial Underwriting Department sent Listak a form letter, along with a photocopy of his application, requesting that Listak review the application and correct any erroneous information. On April 20, 1995, a Centennial employee interviewed Listak via telephone, and completed a worksheet based on Listak's answers. Listak denied any adverse medical history.

Teresa Elliott, an underwriter in Centennial's headquarters, performed the underwriting process on Listak's application. When Elliott received the file, it contained Listak's application and a set of MIB codes pertaining to Listak. Listak's MIB reports indicated that he had been diagnosed with Chronic Obstructive Pulmonary Disease ("COPD") within the prior six to ten years, that he had been diagnosed with a heart murmur, and that he had had an abnormal pulmonary function test. (Ex. V, at 18–21). All three of these indications are considered material to the underwriting risk. (Ex. V, at 18–21). Because MIB rules preclude an insurer from making underwriting decisions based on MIB reports, Centennial was required to obtain Listak's actual medical records and test results to assess the underwriting risk and make a coverage decision.

On April 27, 1995, Elliott requested medical records from ASB Meditest (ASB), who had given Listak a physical in 1994. Centennial wrote to Listak on April 28, 1995, informing him that "[a]s a routine part of the underwriting of the application you completed on April 8, 1995, we have written for medical records directly to ASB Meditest (for Charles)." (Ex. X).

In her deposition, Brianna Berthelson of Centennial's underwriting department testified that, while there is no record of any subsequent requests to ASB, she "would have followed up in two weeks with another copy and a phone call to the doctor's office asking them, you know, the reason why we have not received them as of yet." (Ex. Y, at 17). Berthelson testified that she did not believe that ASB responded to her follow-up letter. In fact, ASB did not respond to Centennial's request until approximately June 29, 1995. (Ex. Y, at 16–18; Ex. Z).

On June 26, 1995, Listak entered the Trident Regional Health System facility at Trident Hospital with chest pains. Listak was suffering from congestive heart failure secondary to cancer of the lining of the heart, which had metastasized from his lungs. Plaintiff asserts that upon being admitted to Trident Hospital, Listak and his daughter were informed for the first time that Centennial denied having a policy in effect for Listak. Plaintiff alleges that "[o]nly after learning that the Decedent had a potentially serious medical condition did the Defendant seek additional medical records on the Decedent for the purpose of refusing coverage to him." (Compl., ¶ 19, at 5).

Centennial asserts that the information finally received from ASB on June 29, 1995, failed to explain the MIB codes. Centennial then sought details of the codes directly from MIB, who refuses to explain its codes until an insurer has attempted its own investigation. (Ex. V, at 35–36). Centennial received the code details on July 6, 1995, which indicated that the underwriter should obtain Dr. Baggett's records. (Ex. V, p. 36; Ex. AA). Centennial requested Dr. Baggett's records on July 7, 1995. (Ex. BB). Centennial's underwriting department notified Listak on July 10, 1995, that, "[a]s a routine part of the underwriting of the application you completed on April 8, 1995, we have written for medical records directly to Dr. D. Baggett." (Ex. CC).

Dr. Baggett's records showed that Listak had been diagnosed with COPD in 1986. Centennial asserts that based on these records, the underwriting department declined to underwrite Listak's application without proof of good health. In her affidavit, Elliott states that the pulmonary function test ("PFT") administered on Listak on November 29, 1994, shows an FEV–1 of 2.21 liters and 2.16 liters on successive tests, while the normal FEV–1 for a male of Listak's height and age is 4.1 liters of air expelled in one

second. (Aff. of Elliott, ¶¶ 11–13, Ex. EE). Elliott further states that the test showed an FVC for Listak as 3.99 liters and 4.17 liters on successive tests, with the normal indicated FVC for a male of his height and age of 5.0 liters. (Aff. of Elliott, ¶ 14, Ex. EE). Elliott states that according to Centennial's underwriting guidelines, attached to Exhibit EE, the FEV–1 reading falls within the severe category, and the FVC reading falls within the mild category. (Aff. of Elliott, ¶ 18, Ex. EE). Elliott testified that the Centennial's guidelines require that an applicant of Listak's age, with Listak's test results, be declined. (Aff. of Elliott, ¶ 20, Ex. EE). Finally, Elliott's affidavit states that if ABS Meditest had provided Listak's PFT result when requested, she would have immediately declined Listak's application without further inquiry. (Aff. of Elliott, ¶ 26, Ex. EE).[3]

Defendant wrote to Listak on July 17, 1995, stating that Listak's application had been denied "due to medical history from Dr. Baggett." (Ex. DD). The letter also stated that the underwriting department would reconsider Listak's application "with current pulmonary function studies." (Ex. DD). Listak died of lung cancer in November of 1995.

Defendant contends that no contract was ever entered into between Listak and Defendant. Defendant further alleges that "at the time [Listak] executed the application, he was well aware of certain medical conditions and personal medical history which he did not disclose on the application." (Def.'s Resp. to Int., at 2).

## III. ANALYSIS

### A. Standard for Summary Judgment

To grant a motion for summary judgment, this court must first find that "there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c). This court is not to weigh the evidence, but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If

no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). All evidence must be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–23 (4th Cir.1990). Finally, summary judgment is not appropriate "[w]here states of mind are decisive as elements of a claim or defense." *Overstreet v. Kentucky Central Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir.1991).

### B. Defendant's Motion for Summary Judgment

Centennial argues that it is entitled to summary judgment because (1) no contract existed between Listak and Centennial; (2) recovery would be barred under the South Carolina Code for misrepresentations by Listak; (3) the action would be barred by South Carolina common law due to Listak's misrepresentations; and (4) Plaintiff fails to make out essential elements of her claims for breach of contract, bad faith, breach of contract with fraudulent intent, and negligent misrepresentation.

### 1. Existence of a Contract between the Parties

Centennial moves for summary judgment on the basis that it had no contract with Listak. First, Centennial argues that Plaintiff cannot prove the existence of an actual or implied contract, because Listak's application was never accepted. Second, Centennial denies that any implied contract arose from the alleged statements of Benke, because those alleged statements are inadmissible hearsay, and because Listak knew that Benke did not have authority to promise that his application would be acted upon within a certain period of time. Finally, Centennial argues that no

---

**3.** Elliott testified in her deposition that, based on the MIB codes and Listak's application, her conclusion was that Listak was not insurable. She did not immediately inform Listak that Centennial was declining coverage, however, because this would violate MIB rules and result in Centennial's loss of membership in MIB. (Ex. V, at 23–24).

contract arose because Listak was not at the time "in good health and insurable condition," as required by the "sound health" clauses in the policy and application.

Under South Carolina case law, a layperson who makes out an application and pays a premium is justified in assuming that payment will bring immediate protection, unless he is told of limiting conditions which would prevent the creation of a policy at that time. *Crossley v. State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 415 S.E.2d 393 (1992); *Poston v. National Fidelity Life Ins. Co.*, 303 S.C. 182, 399 S.E.2d 770 (1990). When the insurer does inform the applicant of limiting conditions, it must use clear and unequivocal language and it must call that language to the attention of the applicant. *Id.*

In this case, Listak was not a layperson, but a trained insurance salesman who was familiar both with the policy for which he was applying and with that policy's limitations on acceptance of an insurance application. Furthermore, the limiting conditions were clearly stated and brought to Listak's attention. Finally, Listak received letters from Centennial from April until July of 1995, informing Decedent that his application was under investigation and that a decision had not yet been made. Therefore, the court finds that Plaintiff cannot show a genuine issue of fact as to whether there was a contract between Centennial and Listak pursuant to the *Crossley* line of cases.

Plaintiff asserts that Centennial impliedly accepted Listak's application based on the following "circumstances:"

1. Defendant's undue delay in notifying Listak of its "withdrawal" of coverage;

2. The fact that Listak obtained a temporary policy to protect himself during the contemplated coverage lag time;

3. Defendant's own correspondence dated April 28, 1995 thanking Listak for the interest he had shown in Centennial and informing him of their routine request for medical records needed as a part of the underwriting process;

4. Defendant's failure to notify Listak of its denial of coverage when it knew as early as April 11, 1995, that coverage would likely be denied; and

5. Defendant's own knowledge that Listak's temporary coverage would expire as of May 15, 1995.

First, Defendant never issued a policy to Listak, so its actions in denying the application cannot be construed as "withdrawal" of coverage. Second, it is undisputed that Listak knew of Centennial's policy in not approving an application until it has verified the applicant's medical information. Third, Listak's actions in obtaining a temporary policy of insurance have no bearing on the existence of a contract between the parties. Those actions simply show that Listak believed he would be able to obtain a policy from Centennial by the time his temporary policy expired. Fourth, Centennial's underwriting agent testified that she could not have denied coverage to Listak in April based solely on the MIB codes, because this would violate MIB policy. Instead, the codes led the underwriter to the medical reports documenting adverse medical history. It is undisputed that Centennial did not receive the medical report documenting his COPD diagnosis until July of 1995. Therefore, while Centennial may have had a basis to deny the application in April, the underwriter was required first to obtain medical records confirming the adverse information indicated in the MIB codes.

Based on these factors, the court finds that Plaintiff has failed to raise a genuine issue of material fact as to whether the circumstances in this case formed a contract between Centennial and Listak.

### C. Validity of Any Existing Contract

Centennial argues that any contract which may have arose is void both under common law as a result of the insured's material misrepresentations, and under S.C.Code Ann. § 38–71–40. That statute provides that a false statement in an application voids the policy if it was made with an intent to deceive or materially affected the risk, or materially affected the hazard assumed by the insurer. Because the court finds that there was no contract formed between the parties. it does not reach the question of contractual

validity. Furthermore, Centennial's counterclaim for a declaratory judgment "that any contract, the existence of which is denied, which could have existed between the parties be declared null, void and of no affect [sic]," is moot.

### D. Remaining Causes of Action

Third, Centennial moves for summary judgment as to Plaintiff's remaining causes of action. Because the court has found no contract between the parties, Centennial is entitled to summary judgment as to Plaintiff's claims for bad faith insurance practice and breach of contract accompanied by a fraudulent act.

■ Finally, Centennial moves for summary judgment on Plaintiff's claim for negligent misrepresentation. To prove negligent misrepresentation, a plaintiff must establish that the defendant, with a pecuniary interest in doing so, made a false representation on which the plaintiff justifiably relied, that the defendant owed a duty of care to see that he communicated truthful information to the plaintiff, that the defendant breached that duty, and that the plaintiff suffered a loss as a result. *Harrington v. Mikell*, 321 S.C. 518, 469 S.E.2d 627 (Ct.App.1996).

Plaintiff argues that she has raised a genuine issue of material fact as to her claim for negligent misrepresentation based on the following argument:

Clearly Plaintiff has established through Kimie Listak's deposition testimony that Mr. Benke assured Mr. Listak that he would be covered shortly after application. Further, Defendant's failure to notify Mr. Listak that coverage would be withdrawn in April 1995, when it immediately became privy to that information, operated as a tacit representation that coverage would not be denied. Obviously, Defendant had a pecuniary interest in making these representations. By promising coverage and leading Mr. Listak down the primrose path for some two months after the application for benefits was submitted, Defendant could wait and decide whether Mr. Listak would become sick in the short months to come. If he were to become sick, which he

did, the insurer could conveniently create reasons for its eventual denial of coverage.

(Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J., at 25–26).

■ This court finds Plaintiff's argument unpersuasive. As discussed above, it is undisputed that Listak was well aware of Centennial's policy in refusing to accept an insurance application until it has received the applicant's medical information. Therefore, even if the testimony of Kimie Listak were not inadmissible hearsay, evidence of Benke's alleged assurances to Listak could not have reasonably been relied upon by Listak.

Furthermore, as discussed above, Centennial has explained its failure until July of 1995 to notify Listak of his application's denial. While the delay in this case does appear long, Plaintiff has not shown that the delay contributed to any misrepresentations on Centennial's part. Listak knew that the application was being considered pending investigation of his medical history. He received several letters notifying him that Centennial was seeking reports from specific medical providers, and requesting Listak's assistance in expediting the receipt of this information.

■ Finally, Plaintiff has not raised a genuine issue of material fact as to whether Centennial's denial of his application was wrongful. Centennial's underwriter testified that while she knew Listak had been admitted to the hospital, she did not learn why he was in the hospital before making the underwriting decision. (Ex. V, at 53). Elliott testified that she based the underwriting decision on information obtained from Dr. Baggett, and that the decision had nothing to do with Listak's hospitalization. (Ex. V, at 53). When evaluated according to Centennial's written standards, Listak's medical information warranted denial of coverage.

### IV. CONCLUSION

For the foregoing reasons, it is therefore,

**ORDERED**, that Defendant's Motion for Summary Judgment be **GRANTED**; and

746

**ORDERED**, that Defendant's Counterclaim for Declaratory Judgment be **DISMISSED**.

**AND IT IS SO ORDERED.**